MISHARA CONSTRUCTION COMPANY, INC. *vs.* TRANSIT-MIXED CONCRETE CORP.

Middlesex.    January 10, 1974. — April 17, 1974.

Present: TAURO, C.J., REARDON, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Contract*, Performance and breach, Requirements contract, Labor dispute. *Practice, Civil*, Requests for rulings, Instructions to jury.

Even though requests for instructions in an action were correct statements of the law that a contract which calls for deliveries of goods as required on a particular building project is sufficiently specific as to quantity and time to be an enforceable contract, there was no error in a failure to instruct the jury in precisely the form requested where the instructions given adequately covered such matters. [124-125]

Even though a request for instructions by the plaintiff in an action was a correct statement of the law that a contract whereby the defendant was to furnish the plaintiff all the concrete required on a certain building project was not terminable until the plaintiff received all of the concrete needed, the request was not appropriate and was properly refused. [125-126]

In an action for breach of a contract by the defendant by failing to deliver concrete to a building project, there was no error in refusing to instruct the jury that on the evidence a finding was required that the defendant broke the contract where the principal issue was whether, on the evidence, the defence of impossibility of performance had been established by the defendant. [126]

Discussion of impossibility of performance of contracts for sale of goods under G. L. c. 106, § 2-615. [126-129]

. In an action for breach of a contract by the defendant in failing to deliver concrete to a building project, it was a question of fact for the jury whether difficulty the defendant might have encountered in attempting to make deliveries through a picket line maintained at the delivery site in a labor dispute provided the defendant with the defence of impossibility of performance under G. L. c. 106, § 2-615. [129-131]

CONTRACT. Writ in the Superior Court dated October 16, 1970.

The action was tried before *Tomasello, J.*

*David C. Hawkins* for the plaintiff.

*Andrew T. Campoli,* for the defendant, submitted a brief.

REARDON, J.   In this action of contract a verdict was returned for the defendant. The case is here on the plaintiff's exceptions.

The plaintiff Mishara Construction Company, Inc. (Mishara) was the general contractor under contract with the Pittsfield Housing Authority for the construction of Rose Manor, a housing project for the elderly. In September, 1966, the plaintiff negotiated with the defendant Transit-Mixed Concrete Corp. (Transit) for the supplying of ready-mixed concrete to be used on the project. An agreement was reached that Transit would supply all the concrete needed on the project at a price of $13.25 a cubic yard, with deliveries to be made at the times and in the amounts as ordered by Mishara. This agreement was evidenced by a

purchase order signed by the parties on September 21, 1966. That purchase order identified the Rose Manor project and indicated that delivery was to be made "[a]s required by Mishara Construction Company." Performance under this contract was satisfactory to both parties until April, 1967. In that month a labor dispute disrupted work on the job site. Although work resumed on June 15, 1967, a picket line was maintained on the site until the completion of the project in 1969. Throughout this period, with very few exceptions, no deliveries of concrete were made by Transit notwithstanding frequent requests by Mishara. After notifying Transit of its intention, Mishara purchased the balance of its concrete requirements elsewhere. Mishara sought in damages the additional cost of concrete incurred by virtue of the higher price of the replacement product, as well as the expenses of locating an alternate source.

The plaintiff's exceptions relate to the introduction of certain evidence and the failure of the trial judge to give certain requested instructions. Requests 2 and 3 sought instructions that the requirements that a definite quantity of goods and a definite duration of performance be specified in an enforceable contract are satisfied if the contract is one which calls for deliveries as required on a particular project. Since this is a contract for the sale of goods it is governed by the Uniform Commercial Code. G. L. c. 106. "Requirements contracts" of the kind the plaintiff contends was present here are explicitly recognized as valid by the Code in G. L. c. 106, § 2-306 (1).[1] The Official Comment No. 2 to that section makes clear the drafters' intention that when quantity is phrased only in terms of output or requirements the contract "is not too indefinite since it is held to mean the actual good faith output or requirements" of the buyer

---

[1] "Output, Requirements and Exclusive Dealings. (1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded."

or seller. Such a view is consistent with the established law of Massachusetts. *Royal Paper Box Co.* v. *E. R. Apt Shoe Co.* 290 Mass. 207 (1935). *Neofotistos* v. *Harvard Brewing Co.* 341 Mass. 684 (1961). Nor is a supply contract tied to a particular project too indefinite with respect to duration. This is not a case in which no time for performance is set out in the contract, and in which the court by long established rule will imply a reasonable time. Cf. *Cohen* v. *Wintman*, 236 Mass. 471, 472 (1920); G. L. c. 106, § 2-309 (1). Although no specific date is named in the contract, the time is sufficiently determined by the occurrence of a specified event, i.e., the completion of the project. In *Phelps* v. *Shawprint, Inc.* 328 Mass. 352 (1952), in which payments were to continue so long as certain defendants were associated with the defendant corporation, it was said at pp. 354-355: "The contract was not silent on this aspect for it carried its own measure of time. . . . Such a contract is not too indefinite or uncertain to be enforceable at least for partial breaches even though it is impossible to predict precisely when the contingency will occur that will bring the contract to an end." See *Proctor* v. *Union Coal Co.* 243 Mass. 428 (1923); G. L. c. 106, § 2-309, comment No. 1. Therefore both of Mishara's requests were correct as matters of law. We believe, however, that these points were adequately covered in the judge's charge albeit in less than perfect form. There was no error in the failure to give instructions in precisely the form requested. *Palmer Russell Co.* v. *Rothenberg*, 328 Mass. 477, 482-483 (1952). *Campbell* v. *Shea*, 332 Mass. 422, 425 (1955).

Request 9 was an instruction that the contract was not terminable until Mishara had received all the concrete it required for the project. Again, although this was a correct statement of the law, we believe it was not error for the judge to refuse it. As has been shown, the specification of deliveries as needed on the project was a sufficiently definite statement of the time for performance. Therefore this was not a contract which contemplated ongoing and open-ended performance which would be terminable on reasonable notice. G. L. c. 106, § 2-309, and comment

No. 1. *Simons* v. *American Dry Ginger Ale Co. Inc.* 335 Mass. 521 (1957). Since, however, there was no indication from the evidence or the judge's charge that this was such a contract, there was no need to charge that it was not. A request correct in law but not appropriate to the conditions of a case is properly refused. *Altavilla* v. *Old Colony St. Ry.* 222 Mass. 322 (1916). *McNeil* v. *Middlesex & Boston St. Ry.* 233 Mass. 254, 256 (1919). Since it is unlikely that the jury would on their own initiative come to the conclusion that this was a contract which could properly be terminated prior to completion of performance by either party, it would have been misleading for the judge to charge that it was not terminable by the defendant. See *Dixon* v. *New England R.R.* 179 Mass. 242, 247 (1901).

Nor was there error in the refusal to give request 13, that on the evidence the jury "must find that [the] defendant breached its contract with [the] plaintiff by failing to deliver" Mishara's concrete requirements. The principal issue in the case was the defendant's claimed excuse of impossibility of performance. The determination of that issue depended on facts and circumstances which were for the jury to decide. While we suppose one could develop a nice technical argument that impossibility does not nullify a breach but rather provides an excuse for it, to give the instruction requested would surely have misled the jury on the ultimate question of liability. Moreover, the failure to give it was of no detriment to the plaintiff of which it can complain. See *Howes* v. *Grush*, 131 Mass. 207 (1881). *Dixon* v. *New England R.R.*, *supra*.

The remainder of the plaintiff's exceptions relate to the proffered defence of the impossibility of performance. Objection was made to the introduction of all evidence regarding the existence of a picket line at the job site and the difficulty which Transit did encounter or might have encountered in attempting to make deliveries through that picket line. Furthermore, Mishara requested an instruction that Transit "was required to comply with the contract

regardless of picket lines, strikes or labor difficulties."[2] As a result Mishara would have completely withdrawn the question of impossibility resulting from the picket line from the jury. We are asked to decide as matter of law and without reference to individual facts and circumstances that "picket lines, strikes or labor difficulties" provide no excuse for nonperformance by way of impossibility. This is too sweeping a statement of the law and we decline to adopt it.

The excuse of impossibility in contracts for the sale of goods is controlled by the appropriate section of the Uniform Commercial Code, G. L. c. 106, § 2-615. [3] That section sets up two requirements before performance may be excused. First, the performance must have become "impracticable." Second, the impracticability must have been caused "by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made." This section of the Uniform Commercial Code has not yet been interpreted by this court. Therefore it is appropriate to discuss briefly the significance of these two criteria.

With respect to the requirement that performance must have been impracticable, the official Code comment to the section stresses that the reference is to "commercial im-

---

[2] Requests 16 and 17 essentially asked for instructions that in the absence of clauses in the contract to the contrary, the impossibility of performance provides no excuse. This, in effect, requires a charge that no set of circumstances will ever excuse a supplier from performing. Since we conclude in the text that request 15, to the effect that picket lines and labor disputes provide no excuse, is an incorrect statement of the law, it follows a fortiori that these requests were rightly refused.

[3] "Excuse by Failure of Presupposed Conditions.

"Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance

"(a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid."

practicability" as opposed to strict impossibility. G. L. c. 106, § 2-615, comments 3-4. This is not a radical departure from the common law of contracts as interpreted by this court. Although a strict rule was originally followed denying any excuse for accident or "inevitable necessity," e.g., *Adams* v. *Nichols,* 19 Pick. 275 (1837), it has long been assumed that circumstances drastically increasing the difficulty and expense of the contemplated performance may be within the compass of "impossibility." See *Rowe* v. *Peabody,* 207 Mass 226, 233-234 (1911) (dictum); *Fauci* v. *Denehy,* 332 Mass. 691, 696-697 (1955). By adopting the term "impracticability" rather than "impossibility" the drafters of the Code appear to be in accord with Professor Williston who stated that "the essence of the modern defense of impossibility is that the promised performance was at the making of the contract, or thereafter became, impracticable owing to some extreme or unreasonable difficulty, expense, injury, or loss involved, rather than that it is scientifically or actually impossible." Williston, Contracts (Rev. ed.) § 1931 (1938). See Restatement: Contracts, § 454 (1932); Corbin, Contracts, § 1339 (1962).

The second criterion of the excuse, that the intervening circumstance be one which the parties assumed would not occur, is also familiar to the law of Massachusetts. *Baetjer* v. *New England Alcohol Co.* 319 Mass. 592, 600 (1946). *Boston Plate & Window Glass Co.* v. *John Bowen Co. Inc.* 335 Mass. 697, 699-700 (1957). The rule is essentially aimed at the distribution of certain kinds of risks in the contractual relationship. By directing the inquiry to the time when the contract was first made, we really seek to determine whether the risk of the intervening circumstance was one which the parties may be taken to have assigned between themselves. It is, of course, the very essence of contract that it is directed at the elimination of some risks for each party in exchange for others. Each receives the certainty of price, quantity, and time, and assumes the risk of changing market prices, superior opportunity, or added costs. It is implicit in the doctrine of impossibility (and the

companion rule of "frustration of purpose") that certain risks are so unusual and have such severe consequences that they must have been beyond the scope of the assignment of risks inherent in the contract, that is, beyond the agreement made by the parties. To require performance in that case would be to grant the promisee an advantage for which he could not be said to have bargained in making the contract. "The important question is whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract. If so, the risk should not fairly be thrown upon the promisor." Williston, Contracts (Rev. ed.) § 1931 (1938). The emphasis in contracts governed by the Uniform Commercial Code is on the commercial context in which the agreement was made. The question is, given the commercial circumstances in which the parties dealt: Was the contingency which developed one which the parties could reasonably be thought to have foreseen as a real possibility which could affect performance? Was it one of that variety of risks which the parties were tacitly assigning to the promisor by their failure to provide for it explicitly? If it was, performance will be required. If it could not be so considered, performance is excused. The contract cannot be reasonably thought to govern in these circumstances, and the parties are both thrown upon the resources of the open market without the benefit of their contract. See *Boston Plate & Window Glass Co.* v. *John Bowen Co. Inc.*, *supra*, at 699-700.

With this backdrop, we consider Mishara's contention that a labor dispute which makes performance more difficult never constitutes an excuse for nonperformance. We think it is evident that in some situations a labor dispute would not meet the requirements for impossibility discussed above. A picket line might constitute a mere inconvenience and hardly make performance "impracticable." Likewise, in certain industries with a long record of labor difficulties, the nonoccurrence of strikes and picket

lines could not fairly be said to be a basic assumption of the agreement. Certainly, in general, labor disputes cannot be considered extraordinary in the course of modern commerce. See Restatement: Contracts, § 461, illustration 7 (1932). Admitting this, however, we are still far from the proposition implicit in the plaintiff's requests. Much must depend on the facts known to the parties at the time of contracting with respect to the history of and prospects for labor difficulties during the period of performance of the contract, as well as the likely severity of the effect of such disputes on the ability to perform. From these facts it is possible to draw an inference as to whether or not the parties intended performance to be carried out even in the face of the labor difficulty. Where the probability of a labor dispute appears to be practically nil, and where the occurrence of such a dispute provides unusual difficulty, the excuse of impracticability might well be applicable. Thus in discussing the defence of impossibility, then Chief Judge Cardozo noted an excuse would be provided "conceivably in some circumstances by unavoidable strikes." *Canadian Industrial Alcohol Co. Ltd.* v. *Dunbar Molasses Co.* 258 N. Y. 194, 198 (1932). The many variables which may bear on the question in individual cases were canvassed by Professor Williston in Williston, Contracts (Rev. ed.) § 1951A (1938), and he concluded that the trend of the law is toward recognizing strikes as excuses for nonperformance. We agree with the statement of the judge in *Badhwar* v. *Colorado Fuel & Iron Corp.* 138 F. Supp. 595, 607 (S. D. N. Y. 1955), affd. 245 F. 2d 903 (2d Cir. 1957), on the same question: "Rather than mechanically apply any fixed rule of law, where the parties themselves have not allocated responsibility, justice is better served by appraising all of the circumstances, the part the various parties played, and thereon determining liability." Since the instructions requested by the plaintiff and the exclusion of the evidence objected to would have precluded such a factual determination, the requests were more properly

refused,[4] and the evidence was properly admitted.

*Exceptions overruled.*

---

[4] As has been noted, we have not had a previous occasion to address ourselves to
this question in light of the Uniform Commercial Code. Therefore it is not
surprising that the charge actually given by the trial judge was less than ideal on
this point. But no general exception was taken to the charge given, only to the
failure to give the specific instructions discussed in the opinion. Since those
requests were incorrect as matter of law, there was no error in refusing them.