The **OPERA COMPANY OF BOSTON, INC., Appellee,**

v.

The **WOLF TRAP FOUNDATION FOR the PERFORMING ARTS, Appellant.**

No. 86–2505.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 13, 1986.

Decided May 4, 1987.

Rodney F. Page (David L. Kelleher, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., on brief), for appellant.

Edward Gross, for appellee.

Before RUSSELL and HALL, Circuit Judges, and McMILLAN, United States District Judge for the Western District of North Carolina, sitting by designation.

DONALD RUSSELL, Circuit Judge:

This is a breach of contract suit by the plaintiff to recover the agreed payment from the defendant for four operatic performances at the Filene Center in The Wolf Trap Park. The plaintiff asserts it was prepared, able and willing to perform as agreed but that it was prevented from giving one of the performances because of cancellation by the defendant of the performance on the ground it considered the performance impossible as a result of an electrical storm which terminated power to the pavillion during the time this performance was to be given. The court found against defendant's claim of cancellation of the performance because of an unexpected occurrence and granted judgment in favor of plaintiff. Defendant has appealed. We reverse and remand with instructions.

## I.

The parties in this suit are the The Opera Company of Boston, Inc., an operatic organization recognized both nationally and internationally. The defendant The Wolf Trap Foundation for the Performing Arts is an organization for the advancement of the performing arts headquartered at Vienna, Virginia, and as such sponsors at the Filene Center in the Wolf Trap Park [1] operatic performances and similar artistic programs. The Filene Center is located in the Wolf Trap National Park and is a part of the various facilities maintained and controlled by the National Park Service. It consists of a main stage tower, an auditorium and an open lawn. The main stage tower contains the stage, dressing rooms and space for the scenery and electrical effects. In front of the tower is a covered auditorium seating approximately 3,500 people. Beyond this is the uncovered lawn providing seating for an additional 3,000 people. The Park provides parking space. This parking area is separated from the Center itself. A number of pathways leading from the parking area to the Filene Center are available. The distance of the parking area from the Center varies from approximately 300 to 700 yards. Ordinarily, when there are any night performances at the Center, the roads in the park, the parking area and the pathways to the Center are lighted for the guidance of patrons at performances at the Center.

This suit between the parties arises under a contract between the plaintiff The Opera Company of Boston, Inc. (Opera Company) and the defendant The Wolf Trap Foundation for the Performing Arts (Wolf Trap) by which the Opera Company for its part agreed to give four "fully staged orchestrally accompanied [operatic] performances to the normally recognized standards" of the Opera Company on the nights of June 12, 13, 14 and 15, 1980 at the Filene Center. For this the Opera Company was to be paid by Wolf Trap $272,000 payable under a schedule providing for payment of $20,000 at the signing of the contract and a further $40,000 on April 1, 1980, with the balance payable in four equal installments before the rise of the curtain on each performance. Wolf Trap, in turn, for its part under the contract was obliged to make the above payments and also to furnish the place of performance including an undertaking "to provide lighting equipment as shall be specified by the Opera Company of Boston's lighting designer." [2]

Both parties to the contract performed apparently all their obligations under the contract through the operatic performance on June 14. These performances had been fully sold as well as had the remaining performance on June 15. During this final day, the weather was described as hot and humid, with rain throughout the day. Sometime between 6:00 and 6:30 p.m. a

---

1. Wolf Trap Park is a national park owned by the United States Government and operated under the jurisdiction of the National Park Services.

2. The contract included a number of other provisions but such provisions are irrelevant to the resolution of the issues posed by the action.

severe thunderstorm arose causing an electrical power outage. As a result all electrical service in the Park, in its roadways, parking area, pathways and auditorium were out. Conferences were had among representatives of the Park Service and that of Wolf Trap. The public utility advised that it would be at least after eleven o'clock before any service by it could be resumed in the Park and that it was likely power might not be available before morning. Various alternatives for supplying power were considered but none was regarded as relieving the situation. Already some 3,000 people were in the Park for the performance; 3,500 more were expected before 8:00 p.m. when the performance was to begin. The Park Service recommended the immediate cancellation of the performance and advised Wolf Trap if the performance were not cancelled, it disclaimed any responsibility for the safety of the people who were to attend as well as those who were to perform. It was the Park Service's view that a prompt cancellation was necessary to enable the parties to leave the park safely and to prevent others from coming. Wolf Trap agreed and the performance was cancelled. While some of these discussions were being carried on a representative of the Opera Company was present but she took no part in the decision to cancel, though she voiced no objection. Since the performance was cancelled, Wolf Trap failed to make the final payment under the contract to the Opera Company. Five years after the cancellation, the Opera Company filed this suit to recover the balance due under the contract. Wolf Trap defended on the ground that performance by it of its obligation under the contract was excused under the doctrine of impossibility of performance.[3] The basis for this defense was that the final performance by the Opera Company for which payment was claimed had been cancelled because a performance was impracticable as a result of the power outage.

II.

The district judge began his oral opinion granting judgment in favor of the plaintiff by noting that the parties had stipulated the contract in question, a memorandum detailing the occurrence at the Park on the evening of June 15 by Craig Hankenson, an official of Wolf Trap, and the amount in issue. He then proceeded to find the storm, which caused the power shortage in the Wolf Trap Park, resulted in a complete loss of power at Filene Hall from about 6 o'clock on the evening of June 15. He apparently accepted the accuracy of Mr. Hankenson's memorandum that the performance on the night of June 15 was cancelled "based on a public safety decision, that the performance should not go forward since there was no lighting in the parking area to the walkways, and very questionable as to whether or not a generator could be set up to provide additional light for the theater itself and still provide adequate light for the people who had to move backstage." He found as a fact "that the Opera Company was there [at the Park] and was ready to go forward with the performance," but that "the only reason the performance did not go on was the fact that there wasn't adequate lighting." As he read the contract Wolf Trap was obligated to provide sufficient lighting "for the performance to go on," and that power outages were "reasonably foreseeable," as there had been some outages in the past and while "none had affected a performance prior to this occasion," it was "readily foreseeable that a power outage could affect a performance." He, therefore, held Wolf Trap had not made out its defense of impossibility of performance and granted judgment for the plaintiff.

The single question on appeal is whether this dismissal of Wolf Trap's defense of impossibility of performance was proper. The resolution of this issue requires a review of the doctrine of impossibility. We proceed first to that review.

---

**3.** Wolf Trap has not argued on this appeal that its non-performance was excused because of an Act of God. For a statement of the rule in connection with the plea of Act of God, *see Sanders v. Coleman,* 97 Va. 690, 34 S.E. 621 (1899).

## III.

The doctrine of impossibility of performance as an excuse or defense for a breach of contract was for long smothered under a declared commitment to the principle of sanctity of contracts. This rationale for constrained application of the doctrine was expressed by the United States Supreme Court in *Dermott v. Jones* (2 Wall.), 69 U.S. 1, 8, 17 L.Ed. 762 (1864):

> The principle which controlled the decision of the cases referred to rests upon a solid foundation of reason and justice. It regards the sanctity of contracts. It requires parties to do what they have agreed to do. If unexpected impediments lie in the way, and a loss must ensue, it leaves the loss where the contract places it. If the parties have made no provision for a dispensation, the rule of law gives none. It does not allow a contract fairly made to be annulled, and it does not permit to be interpolated what the parties themselves have not stipulated.

The growth of commercial activity in the nineteenth century, however, made this rigidity of the doctrine of impossibility both "economically and socially unworkable," *see Cook v. Deltona Corp.*, 753 F.2d 1552, 1558 (11th Cir.1985), and in *Taylor v. Caldwell*, 3 B. & S. 826, 122 Eng.Rep. 309, 324, 6 R.C. 603 (1863), the English courts recognized these changed conditions and, relying largely on civil law precedents,[4] relaxed the constraints on the doctrine by the principle of sanctity of contracts as followed by the English courts since *Paradine v. Jayne*, Alleyn, 27, 23d Charles II (1670). It based such relaxation on the theory of an implied condition arising without express condition in the contract itself. In stating this new rule on impossibility of performance as a defense to a breach of contract suit, the court said:

> The principle seems to us to be that in contracts in which the performance depends on the continued existence of a given person or thing, a condition is im-

plied that the impossibility arising from the perishing of the person or thing shall excuse the performance. In none of the cases is the promise in words other than positive, nor is there any express stipulation that the destruction of the person or thing shall excuse the performance, but that excuse is by law implied, because from the nature of the contract it is apparent that the parties contracted on the basis of the continued existence of the particular person or chattel.

Though the United States Supreme Court had not taken note of *Taylor v. Caldwell* in its decision in *Dermott v. Jones*, rendered the year after *Taylor v. Caldwell*, it, two decades later, adopted the reasoning and the restatement of the doctrine of impossibility as enunciated in *Taylor v. Caldwell* in its decision in *The Tornado*, 108 U.S. 342, 351, 2 S.Ct. 746, 752, 27 L.Ed. 747 (1883). In that case the Court said:

> In *Taylor v. Caldwell*, 3 Best & Smith, 826, it is laid down as a rule, that, "in contracts in which the performance depends on the continued existence of a given person or thing, a condition is implied, that the impossibility of performance arising from the perishing of the person or thing shall excuse the performance." The reason given for the rule is, that without "any express stipulation that the destruction of the person or thing shall excuse the performance," "that excuse is by law implied, because, from the nature of the contract, it is apparent that the parties contracted on the basis of the continued existence of the particular person or chattel."

Other American cases had even earlier embraced the new rule as to impossibility of performance stated in *Taylor v. Caldwell: Dexter v. Norton*, 47 N.Y. 62, 65, 7 Am. Rep. 415 (1871); *Wells v. Calnan*, 107 Mass. 514, 516 (1817); *Walker v. Tucker*, 70 Ill. 527, 543 (1873). Based on all these authorities Lawson in his *The Principles of the American Law of Contracts at Law and in Equity*, § 425 at p. 465 (F.H. Thom-

---

**4.** *See* Bruce, *An Economic Analysis of the Impossibility Doctrine*, XI, The Journal of Legal Studies 211, 324–25 (1982).

as Law Book Co., St. Louis, 1893), stated as the prevalent American rule in this regard:

> Where the contract relates to the use or possession or any dealing with specific things in which the performance necessarily depends on the existence of the particular thing, the condition is implied by the law that the impossibility arising from the perishing or destruction of the thing, without default in the party, shall excuse the performance, because, from the nature of the contract, it is apparent that the parties contracted on the basis of the continued existence of the subject of the contract.

This relaxed rule for the application of the doctrine of impossibility of performance was adopted by the Supreme Court of Virginia, in whose jurisdiction this action arose, in *Virginia Iron, Coal & Coke Co. v. Graham,* 124 Va. 692, 98 S.E. 659, 662 (1919), and again in *Housing Authority, Etc. v. East Tenn. L. & P. Co.,* 183 Va. 64, 31 S.E.2d 273, 276 (1944). In the latter case, the Court, observing that "[t]he tendency of the law is towards an enlargement of the defense, . . ." said:

> It is, however, fairly well settled that where impossibility is due to domestic law, to the death or illness of one who by the terms of the contract was to do an act requiring his personal performance, or to the fortuitous destruction or change in the character of something to which the contract related, or which by the terms of the contract was made a necessary means of performance, the promisor will be excused, unless he either expressly agreed in the contract to assume the risk of performance, whether possible or not, or the impossibility was due to his fault.

In between these two Virginia cases, the United States Supreme Court in *Texas Co. v. Hogarth Shipping Co.,* 256 U.S. 619, 629–30, 41 S.Ct. 612, 614, 65 L.Ed. 1123 (1921) declared:

> [W]here parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and availability, the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall ·be dissolved and the parties excused from performing it.

As we have indicated, *Taylor v. Caldwell,* the United States Supreme Court cases and the Virginia cases all relied in their statement of the doctrine on an implied, though unstated, condition in the contract. Increasingly, though, commentators and text writers were uncomfortable with the implied condition rationale for the new doctrine of impossibility of performance. In 6 Corbin on *Contracts,* § 1331, p. 360 (1962 ed.), the author puts his objection to the implied condition theory strongly and rephrased the rationale for the doctrine thus:

> Though it has been constantly said by high authority, including Lord Sumner, that the explanation of the rule is to be found in the theory that it depends on an implied condition of the contract, that is really no explanation. It only pushes back the problem a single stage. It leaves the question what is the reason for implying a term. Nor can I reconcile that theory with the view that the result does not depend on what the parties might, or would as hard bargainers, have agreed. The doctrine is invented by the court in order to supplement the defects of the actual contract. The parties did not anticipate fully and completely, if at all, or provide for what actually happened.[5]

18 Williston on *Contracts,* § 1937, p. 33 (3d. ed. Jaeger 1978) is equally forceful in its rejection of the implied condition theory:

> Any qualification of the promise is based on the unfairness or unreasonableness of

---

5. The Restatement (Second) on Contracts accepts this statement of the doctrine in its Introductory Note to Chapter 11 ("Impracticability of Performance and Frustration of Purpose") at pp. 310–11.

giving it the absolute force which its words clearly state. In other words, because the court thinks it fair to qualify the promise, it does so and quite rightly; but clearness of thought would be increased if it were plainly recognized that the qualification of the promise or the defense to it is not based on any expression of intention by the parties.

Moreover, in line with the "tendency of the law ... towards an enlargement," [6] modern authorities also abandoned any absolute definition of impossibility and, following the example of the Uniform Commercial Code,[7] have adopted impracticability or commercial impracticability as synonomous with impossibility in the application of the doctrine of impossibility of performance as an excuse for breach of contract. *Matter of Westinghouse Elec. Corp., Etc.,* 517 F.Supp. 440, 451 (E.D.Va.1981).[8]

Under these revisions the doctrine of impossibility of performance is basically according to Corbin one "invented by the court in order to supplement the defects of the actual contract" in the interest of reason, justice and fairness. 6 Corbin on *Contracts* § 1331, p. 360. Williston is equally specific in recognizing that the revision in the doctrine as envisioned by both it and *Corbin* had made the doctrine "essentially an equitable defense, [which could] ... be asserted in an action at law." 18 Williston on *Contracts*, § 1931, p. 6. And, in effect, that was the declaration of the court in *Paddock v. Mason,* 187 Va. 809, 48 S.E.2d 199, 202 (1948). Similarly, Restatement (Second) on Contracts has accepted this view in its statement of the doctrine.

In its Introductory Note to Chapter 11 on Impossibility of Performance (pp. 309–10) Restatement (Second) on Contracts said:

> Even where the obligor has not limited his obligation by agreement, a court may grant him relief. An extraordinary circumstance may make performance so vitally different from what was reasonably to be expected as to alter the essential nature of that performance. In such a case the court must determine whether justice requires a departure from the general rule that the obligor bear the risk that the contract may become more burdensome or less desirable.[9]

This is but another way of declaring, as did Williston, that essentially the doctrine is an equitable one to be applied when fair and just.

The modern doctrine of impossibility or impracticability, deduced from these authorities, has been formulated in § 265, pp. 334–35 of the Restatement (Second) of Contracts in these words:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Supplementing this statement of the doctrine, the Restatement in § 263, p. 328, defines the event the "non-occurrence of which [may be] a basic assumption on which the contract was made":

> an alternative form of performance and, if there is, if it is not "so excessive [in cost of performance] as to make performance extremely impracticable," there is no objective impracticability so far as the obligor is concerned. *See Waegemann v. Montgomery Ward & Co., Inc.,* 713 F.2d 452, 454 (9th Cir.1983).

---

**6.** *See Housing Authority Etc. v. East Tenn. L. & P. Co., supra,* 31 S.E.2d at 276.

**7.** *See* U.C.C. § 2–615(a) (1978).

**8.** Impossibility or impracticability may not be "subjective" but must be "objective," and the difference between the two concepts has been summarized in the phrases "the thing cannot be done" (this being objective impossibility or impracticability) and "I cannot do it" (classified as subjective impossibility or impracticability). *B's Company, Inc. v. Barber & Associates, Inc.,* 391 F.2d 130, 137 (4th Cir.1968); *Ballou v. Basic Construction Co.,* 407 F.2d 1137, 1140–41 (4th Cir.1969). It is often necessary in this connection to consider when the performance, as stipulated, is objectively impossible, whether there is

**9.** *See also* Comment, Restatement (Second) on Contracts § 261: "Even though a party, in assuming a duty, has not qualified the language of his undertaking, a court may relieve him of that duty if performance has unexpectedly become impracticable as a result of a supervening event."

If, . . . the existence of a specific thing is necessary for the performance of a duty . . . its failure to come into existence or its destruction or deterioration makes performance impracticable, [is an event] . . . "the non-occurrence of which was a basic assumption on which the contract was made.

This statement of the revised doctrine is restated in 2–615(a) of the Uniform Commercial Code which excuses non-delivery under a contract "if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made. . . ."

In *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 991 (5th Cir. 1976), the court, adopting the modern statement of the doctrine, said impossibility-impracticability arises as a defense to breach of contract when "the circumstances causing the breach has made performance so vitally different from what was anticipated that the contract cannot reasonably be thought to govern."

A shorter statement of the new rule is given in *Mishara Const. Co., Inc. v. Transit-Mixed Con. Corp.*, 365 Mass. 122, 310 N.E.2d 363, 367 (1974) in which the court said: "It is implicit in the doctrine of impossibility (and the companion rule of 'frustration of purpose') that certain risks are so unusual and have such severe consequences that they must have been beyond the scope of the assignment of risks inherent in the contract, that is, beyond the agreement made by the parties." Probably, though, the fullest statement of the modern doctrine of impossibility or impracticability is that of Judge Wright, speaking for the Court, in *Transatlantic Financing Corporation v. United States*, 363 F.2d 312, 315 (D.C.Cir.1966):

The doctrine of impossibility of performance has gradually been freed from the earlier fictional and unrealistic strictures of such tests as the "implied term" and the parties' "contemplation." Page, *The Development of the Doctrine of Impossibility of Performance*, 18 Mich.L.Rev.

589, 596 (1920). See generally 6 Corbin, *Contracts* §§ 1320–1372 (rev. ed. 1962); 6 Williston, *Contracts* §§ 1931–1979 (rev. ed. 1938). It is now recognized that "A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost." (citing authorities) The doctrine ultimately represents the ever-shifting line, drawn by courts hopefully responsive to commercial practices and mores, at which the community's interest in having contracts enforced according to their terms is outweighed by the commercial senselessness of requiring performance. When the issue is raised, the court is asked to construct a condition of performance based on the changed circumstances, a process which involves at least three reasonably definable steps.

■ In line with these cases, we accept as the correct statement of the modern and prevailing doctrine of impossibility of performance as a defense to a breach of contract to be essentially as equitable in character "based [to quote Williston] on the unfairness or unreasonableness of giving [the contract] the absolute force which its words clearly state" and to be applied under the circumstances so well stated in *Transatlantic.*

■ Manifestly the first fact to be established in making out this modern defense of impossibility or impracticability of performance is the existence of an "occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made." And, in determining the existence of such occurrence, it is necessary to have in mind the Restatement's definition of an "occurrence" in this context as that which, because of the "destruction, or such deterioration" of a "specific thing necessary for the performance" of the contract "makes performance impracticable." [10] The occurrence, as *Transatlantic* puts it, must be unexpected but it does not necessarily have to have been unforeseeable. A requirement of absolute

**10.** Restatement (Second) on Contracts § 263.

non-foreseeability as a condition to the application of the doctrine would be so logically inconsistent that in effect it would nullify the doctrine. This was recognized by Judge Clark in *L.N. Jackson & Co. v. Royal Norwegian Government*, 177 F.2d 694, 699 (2d Cir.1949), where he said that to require an absolute absence of foreseeability would, if accepted,

> practically destroy the doctrine of supervening impossibility, notwithstanding its present wide and apparently growing popularity. Certainly the death of a promisor, the burning of a ship, the requisitioning of a merchant marine on the outbreak of a war could, and perhaps should, be foreseen. In fact, the more common expression of the rule appears to be in terms which tend to state the burden the other way, e.g., that "the duty of the promisor is discharged, unless a contrary intention has been manifested" or "in the absence of circumstances showing either a contrary intention or contributing fault on the part of the person subject to the duty."

Williston expressed the same objection to such an absolute rule. It said:

> It is frequently said that where an event which causes impossibility "might have been anticipated and guarded against in the contract," one who makes an absolute promise is bound by it unconditionally.
>
> Such a test, however, seems of little value. It has descended in the law from a time when it was more nearly true than it now is, because impossibility was more rarely an excuse. Any kind of impossibility is more or less capable of anticipation. The question is one of degree, and if anticipated, any circumstance whatever may be guarded against by the draftsman of the contract.[11]

In Comment c, § 261 of the Restatement (Second) on Contracts the drafters follow this reasoning in the requirement of foreseeability in the application of the doctrine. They said:

If the supervening event was not reasonably foreseeable when the contract was made, the party claiming discharge can hardly be expected to have provided against its occurrence. However, if it was reasonably foreseeable, or even foreseen, the opposite conclusion does not necessarily follow. Factors such as the practical difficulty of reaching agreement on the myriad of conceivable terms of a complex agreement may excuse a failure to deal with improbable contingencies.

These statements of the Restatement and of Williston were accepted and repeated by Judge Wright in the decision in *Transatlantic:*

> Foreseeability or even recognition of a risk does not necessarily prove its allocation. Compare Uniform Commercial Code § 2–615, Comment 1, Restatement, Contracts § 457 (1932). Parties to a contract are not always able to provide for all the possibilities of which they are aware, sometimes because they cannot agree, often simply because they are too busy. Moreover, that some abnormal risk was contemplated is probative but does not necessarily establish an allocation of the risk of the contingency which actually occurs.[12]

As the Court in *Mishara Const. Co., Inc. v. Transit-Mixed Concrete Corp., supra*, 310 N.E.2d at 367 remarked this question is much broader than mere foreseeability and is, "Was the contingency which developed one which the parties could reasonably be thought to have foreseen as a *real possibility* which could affect performance?"[13] and this question is in turn what Judge Learned Hand in *Companhia De Navegacao Lloyd Brasileiro v. C.G. Blake Co.*, 34 F.2d 616, 619 (2d Cir.1929) said was "in the end a question of how unexpected at the time [the contract was made] was the event which prevented performance." After all, as Williston has said, practically any occurrence can be foreseen but whether the foreseeability is sufficient to render unac-

---

**11.** 18 Williston on Contracts, § 1953, pp. 117–18.

**12.** *Transatlantic, supra*, 363 F.2d at 318.

**13.** Emphasis added.

ceptable the defense of impossibility is "one of degree" of the foreseeability and whether the non-occurrence of the event was sufficiently unlikely or unreasonable to constitute a reason for refusing to apply the doctrine. And that is the rule which we think accords with modern reasoning of the doctrine as an equitable doctrine and is the one we approve.[14]

· The second fact to be determined in the proposed application of the doctrine is that the frustration of performance ·was substantial. To satisfy this requirement "[t]he frustration must be so severe that it is not fairly to be regarded as within the risks [the obligor] assumed under the contract." Comment a, § 265 of Restatement (Second) of Contracts And, finally, the defendant asserting the defense must establish that performance was impossible as that term has been ·defined in the refinements of the doctrine.

■ In summary, then, a party relying on the defense of impossibility of performance must establish (1) the unexpected occurrence of an intervening act, (2) such occurrence was of such a character that its non-occurrence was a basic assumption of the agreement of the parties, and (3) that occurrence made performance impracticable. When all those facts are established the defense is made out.

## IV.

■ Applying the law as above stated to the facts of this case, we conclude, as did the district judge, that the existence of electric power was necessary for the satisfactory performance by the Opera Compa-

ny on the night of June 15. While he seems to conclude that public safety was the main consideration on which the cancellation was based, he found that the power outage was the reason assigned for cancellation, and in that connection he found it to be questionable that "a generator could [have been] set up to provide additional light for the theater itself (when power from the utility company became unavailable) and still provide adequate light for the people who had to move backstage." Such findings meet the requirement of Restatement (Second) on Contracts § 263 for an event, the "non-occurrence of which was a basic assumption on which the contract was made" and accordingly satisfies the definition of an impracticability which will relieve the obligor of his duty to perform as declared in section 265 of such Restatement (which we have accepted as the proper present statement of the doctrine of impossibility of performance as a defense to a breach of contract suit). Moreover, the facts as found make out impracticability of performance under the phraseology of the doctrine of impossibility in the Virginia case of *Housing Authority, supra.* The district judge, however, refused to sustain the defense because he held that if the contingency that ˙occurred was one that could have been foreseen reliance on the doctrine of impossibility as a defense to a breach of contract suit is absolutely barred. As we have said, this is not the modern rule and he found that the power outage was foreseeable. In this the district judge erred. Foreseeability, as we have said, is at best but one fact to be considered in

14. We do not intend to suggest that there are not dicta—some even in the more recent decisions—which still adhere to the obsolete rule that foreseeability, whether reasonably likely or not, bars the application of the doctrine. There is in *Eastern Air Lines, supra,* 532 F.2d at 992 a dictum, which, though somewhat ambiguous, could be assumed to support this view. It finds warrant for its dictum in two authorities, *Lloyd v. Murphy,* 25 Cal.2d 48, 54, 153 P.2d 47, 50 (1944) and in *Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co.,* 147 F.2d 399, 403 (2d Cir.1945). *Madeirense* may be quickly dismissed. The opinion in that case was written by Judge Clark who authored the subsequent case of *L.N. Jackson,* quoted *supra.* If his lan-

guage in *Madeirense* could be considered to establish what *Eastern Air Lines* seems to assume (contrary to our reading of the decision) it is difficult to reconcile that construction with the strong contrary declaration of Judge Clark in *L.N. Jackson.* It is noteworthy that any construction of *Lloyd v. Murphy* as stating a rule that foreseeability was an absolute bar to the use of the doctrine as a defense in a breach of contract action was found to be improper by the Ninth Circuit (within whose jurisdiction federal appeals involving California law were reviewable) in *West Los Angeles Institute for Cancer Research v. Mayer,* 366 F.2d 220, 225 (9th Cir. 1966).

resolving first how likely the occurrence of the event in question was and, second whether its occurrence, based on past experience, was of such reasonable likelihood that the obligor should not merely foresee the risk but, because of the degree of its likelihood, the obligor should have guarded against it or provided for non-liability against the risk. This is a question to be resolved by the trial judge after a careful scrutiny of all the facts in the case. The trial judge in this case made no such findings. The cause must be remanded for such findings. In connection with that remand, the parties may be permitted to offer additional evidence on the matters in issue.

Because of the dissent, we would review anew some of the other undisputed facts in this case, it should be noted in this connection that, while the lack of power may have interfered with the immediate commencement of the performance, that, as we have seen, was not the basic consideration which motivated the Park Service in pressing for the cancellation of the performance and it must be remembered that it was the Park Service which was the primary advocate of cancellation. There was, it is admitted, auxiliary power available for the stage and perhaps the dressing rooms furnished by the Park as a part of the Park's service. But to have made this auxiliary service operable would have delayed the commencement of the performance until ten or eleven o'clock. The Park Service's concern was for the safety of the thirty-five hundred people already in the Park and the additional three thousand who were due to come into the Park for the performance. The situation confronting the Park Service must be understood: Should the performance be delayed while the auxiliary services *for the Pavillion* were brought into operation? Even when the auxiliary service was brought into operation, it would not have provided lights for the roads and paths in the wooded park. To have sixty-five hundred people stranded in a wooded park during a lightning storm without any lights for a period of hours was a hazard to safety for which the Park Service was understandably unwilling to take the respon-

sibility. All the parties at the conference—the Park Service, Wolf Trap, and Boston Opera—recognized the problem. After debating it, the agreement to cancel was reached, based, as we have said, primarily on "the Park Service's view that a prompt cancellation was necessary to enable the parties to leave the Park safely and to prevent others from coming." To this decision the Boston Opera's representative did not, it is true, affirmatively agree but she did not dissent. It may be that this situation would not have arisen if the Park had had auxiliary power services which, in the event of a power shortage on the part of the public utility, would have provided ample lighting for the roads and paths in the Park. But can it fairly be said that this was the obligation of Wolf Trap, the lessee of merely the Pavillion area, whatever may have been its obligation for the stage and dressing rooms at the Pavillion itself, or that the failure of Wolf Trap to provide auxiliary lighting for all the roads and paths in the Park was such action on its part as would preclude it from asserting the defense of impossibility of performance *on its part?* We think not.

### CONCLUSION

The judgment herein must, therefore, be vacated and the action remanded to the district court to make findings, based on a statement of reasons, whether the possible foreseeability of the power failure in this case was of that degree of reasonable likelihood as to make improper the assertion by Wolf Trap of the defense of impossibility of performance.

The judgment of the district court is reversed, and the action is remanded with instructions.

**VACATED and REMANDED WITH INSTRUCTIONS.**

McMILLAN, District Judge, dissenting in part and concurring in part:

The majority opinion does an admirable job of analyzing and declaring the state of the court decisions on the doctrine of impossibility of performance.

However, I believe that the District Court takes that law into account and that although he did not fully articulate a classic statement of the law, he reached the right result for the right reasons and ought to be affirmed.

Evening opera on an indoor stage obviously requires power and lights. Supplying power and lights was a necessary part of Wolf Trap's undertaking, a cost figured into their charges for the facility.

The financing and the preparation for the delivery of the essential power required nothing esoteric, inspirational, unforeseeable or expensive.

Mr. Craig Hankenson, a representative of Wolf Trap who apparently negotiated the contract, made a detailed statement about the situation immediately after the cancellation of the concert. On pertinent matters, his statement included the following:

> From my experience in theatres with which I have been affiliated prior to Wolf Trap, I know it is possible to install at the main service panel for the theatre a switchover system so that within 10 minutes an external portable generator or an emergency stage lighting generator can provide emergency service for minimal theatrical lighting and sound. *This is not a major investment.*
>
> Generally every region of the country has a civil defense program which has stationed somewhere in its region a large portable generator. Prior arrangement can be made with the Civil Defense so that in emergencies, such as ours, the generator, which is usually on a trailer, could be transported to the rear of the Theatre.
>
> In my opinion *a far better solution though it is a capital investment of some size is to have a generator of sufficient capacity to deliver power to our stage so that we can carry on a performance with minimal interruption, though we would certainly have to compromise with less than the full lighting and sound which was designed for that performance.*
>
> *It is my feeling that a theater without this capacity is incomplete.* I attach a memo to Claire which I wrote last summer voicing this opinion along with her response.
>
> My memo addressed two equally critical issues: public safety and the ability to continue the performance. Her reply seems to be based solely on public safety and a very "let's wait to see it if it ever happens and then maybe we'll do something" attitude.
>
> *The facts are that we have experienced power outages on several occasions.* It is perhaps a matter of opinion as to how many occurrences can be called frequent. There have been many other occasions of power outage at *Wolf Trap has been very lucky* they *did not occur during the evening* when the performance would have been affected. It can perhaps be said that tonight, too we were lucky. What if the failure had occurred after 9:30 in the middle of the performance in *darkness?*
>
> I recommend that this situation be addressed immediately. *The cost* to the Foundation, the Park Service and the Opera Company of Boston *for the evening's cancellation would go along way if not all the way toward providing emergency backup equipment to prevent such a recurrence.*

[Emphasis added.]

From this evidence, the trial court could rationally have concluded, and did obviously conclude, that performance of this contract was not "impossible"; that power failures were not only foreseeable in an abstract sense, but were, in fact, inevitable; that a theater without emergency capacity to carry on in case of a power outage is "incomplete"; that Hankenson had advised "Claire," chairman of the theater board, of this opinion during the previous summer; that power outages had occurred on several previous occasions; that "Wolf Trap has been very lucky they did not occur during the evening when the performance would have been affected"; and that the "cost to the Foundation, the Park Service and the Opera Company of Boston for the evening's cancellation would go along [sic]

way if not all the way toward providing emergency backup equipment to prevent such a recurrence."

It would have taken only a few seconds to write into the contract a sentence which said, in effect, "If the electric power fails, Wolf Trap will not be responsible for any losses caused by the power failure."

If the parties had agreed to such a provision I would not raise my voice.

They did not so agree.

I do not think we should write for the defendant a defense it did not write for itself.

I would affirm the decision of the trial court.