JUSTICE RICE
dissenting:
¶42 I respectfully dissent. In my view, the majority misapplies the contract doctrine of impossibility and impracticability. Moreover, I believe this case can and should be resolved without reaching the constitutional issues-and without the sweeping constitutional holding-reached by the majority.
¶43 The majority reasons that the facts here are undisputed, as each party asserted entitlement to judgment as a matter of law in filing cross-motions for summary judgment. However, the parties did not stipulate to the facts and argued different versions thereof to this Court and to the court below. Neither the District Court nor this Court is obliged to assume that the facts are undisputed when considering cross-motions for summary judgment-and for good reason. As discussed herein, key facts to the proper adjudication of the doctrine of contract impracticability have been overlooked and misapprehended. I believe the District Court in the present case improperly concluded there were no issues of material fact and misinterpreted the law. As such, I would reverse and remand for further proceedings.
CONTRACT ISSUES
¶44 In affirming the District Court’s order rescinding the parties’ contract, the majority, in my view, unnecessarily expands the doctrine of contract impossibility, in contravention to our case law, and fails to use the abundant caution necessary when applying a rule which allows a party to cancel its contractual obligations. We have previously observed that the starting point for an analysis of impossibility of performance in Montana is the principle that ^Impossibility of performance is a strict standard that can only be maintained where the circumstances truly dictate impossibility.” 360 Ranch Corp. v. R & D Holding (1996), 278 Mont. 487, 493, 926 P.2d 260, 263 (citing Barrett v. Ballard (1980), 191 Mont. 39, 44, 622 P.2d 180, 184). Without *522 mention of 360 Ranch Corp., the majority turns to secondary authority to expand the doctrine to include impracticability. Whether or not this is an advisable course of action, the majority fails, improperly in my view, to consider whether the event rendering performance impracticable was foreseeable and whether the risk was assumed by the parties. Further, the majority provides only a vague standard for application of the doctrine: “[T]he doctrine of impossibility or impracticability is ... applied by courts where ... the public policy underlying the strict enforcement of contracts is outweighed by the senselessness of requiring performance.” I respectfully submit that the Court, in employing such vague concepts, has done a disservice to fundamental contract law which will create considerable uncertainty.
¶45 The Court relies on Opera Co. of Boston v. Wolf Trap Foundation for Performing Arts (4th Cir. 1987), 817 F.2d 1094, as authority for the doctrine of impossibility and impracticability. However, for unstated reasons, the Court does not apply the three-part test set forth in Opera Co. of Boston to the facts of this case. In Opera Co. of Boston, a musical performance was canceled due to a severe lightning storm that disrupted the power supply. The opera company sought payment notwithstanding, claiming they were ready and able to perform their duties under the contract. The Fourth Circuit thoroughly recited the evolution of the doctrines of impossibility and impracticability from the 1800's to current jurisprudence, and identified the widely accepted three-part test to be used when these doctrinal defenses are asserted in a contract action. A party relying on the defense must establish (1) the unexpected occurrence of an intervening act; (2) the occurrence was of such a character that its non-occurrence was a basic assumption of the agreement of the parties; and (3) that occurrence made performance impracticable. When all of these elements are established, the defense is made out. Opera Co. of Boston, 817 F.2d at 1102.
¶46 Because the occurrence must be unexpected, foreseeability of the occurrence is inherent to the application of the test. In Opera Co. of Boston, the court said:
Foreseeability ... is at best but one fact to be considered in resolving first how likely the occurrence of the event in question was and, second whether its occurrence, based on past experience, was of such reasonable likelihood that the obligor should not merely foresee the risk but, because of the degree of its likelihood, the obligor should have guarded against it or provided for non-liability against the risk. This is a question to be resolved by the trial judge after a careful scrutiny of all the facts in the case.
Opera Co. of Boston, 817 F.2d at 1102-1103. The appellate court then remanded the case to the trial court for a factual determination of whether the intervening occurrence-a thunder storm disrupting the power supply-was potentially foreseeable, and whether the obligor should have provided for non-liability or otherwise guarded against it. In contrast to Opera Co. of Boston, the case before us does not involve anything as arguably unpredictable as the weather, making the need for proper application of the doctrine even more compelling.
*523 ¶47 Here, the seller had actual and advance knowledge of the potential for the spreading of the underground pollution. Indeed, the District Court determined, “the undisputed facts show that Cape-France was aware that the plume extended from Buttrey’s and was moving northwesterly towards the subject property.” Despite this knowledge, Cape-France, an experienced developer, entered into a contract to sell the property to Peed and Moore and made no effort to guard against the potential occurrence or to provide for potential liability.
¶48 It should not have come as a surprise to Cape-France when it was notified by the Department of Environmental Quality that a testing requirement would be imposed upon the proposed subdivision to be certain that the underground perchlorethylene plume had not advanced to the vicinity. However, the District Court characterized this regulatory requirement as a “new, unknown and unexpected development,” that “could expose Cape-France as landowners to liability exposure of an unquantifiable nature.” On this basis, the District Court concluded that “[i]t was impossible for Cape-France to proceed further with the subdivision and zoning issues without exposing itself to a huge risk,” and therefore, Cape-France’s performance of the contract was rendered impracticable.
¶49 In affirming the District Court, the majority ignores the issue of foreseeability by relying on § 261 of the Restatement (Second) of Contracts, which does not require the impracticability event itself to be unexpected. Rather, § 261 refers to those situations where “performance has unexpectedly become impracticable as a result of a supervening event.” Restatement (Second) of Contracts § 261, cmt. a. (1981) (emphasis supplied). A supervening event is one which occurs after the contract is made. The record is clear that neither the plume, nor the relevant subdivision and environmental laws, are the result of events which occurred after the contract in the present case was made. These pre-existed the contract.
¶50 If this Court is going to turn to the Restatements for guidance, either § 264 or § 266 of the Restatement (Second) of Contracts would be more applicable. Section 264 is an extension of § 261, but addresses those specific instances where a contractual duty is rendered impracticable by supervening governmental action:
§ 264. PREVENTION BY GOVERNMENTAL REGULATION OR ORDER. If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the nonoccurrence of which was a basic assumption on which the contract was made.
Section 264 suggests wide latitude in interpreting the terms “regulation” and “order.” Thus, the Court could take the view that DEQ’s determination to require a test well, though based on laws and regulations which pre-existed the contract, were supervening governmental orders. However, the Restatement would still require the Court to consider whether the regulatory impediments at issue *524 were foreseeable and the risks voluntarily assumed by the parties. As the official Comment recognizes:
With the trend toward greater governmental regulation, however, parties are increasingly aware of such risks, and a party may undertake a duty that is not discharged by such supervening governmental actions, as where governmental approval is required for his performance and he assumes the risk that approval will be denied (Illustration 3). Such an agreement is usually interpreted as one to pay damages if performance is prevented rather than one to render a performance in violation of law.
Illustration 3, § 264, cmt. 1 (1981), Restatement (Second) of Contracts, is particularly instructive and is set forth below:
A, a manufacturer of sewage treatment equipment, contracts to design and install a central sewage treatment plant, for which B, a developer of a residential subdivision, contracts to pay.' The parties understand that A must obtain the approval of the state Department of Health before installation. A is unable to install the plant because the Department of Health disapproves the plans. If the court concludes, on the basis of A’s experience and the absence of any limitation in the contract, that A assumed the risk that approval would be denied, it will decide that A’s duty to install the plant is not discharged and that A is liable to B for breach of contract. Cf. Illustration 3 to § 266.
Thus, if the Court has determined that supervening events impeded Capé-France’s performance, the Court should apply § 264, Restatement (Second) of Contracts, and then consider whether Cape-France assumed such a risk under the contract.
¶51 Aternatively, the Court could have determined that both the perchlorethylene plume and the environmental and subdivision regulations existed at the time the contract was made, and turned to § 266. Section 266 provides, in pertinent part, as follows:
§ 266. EXISTING IMPRACTICABILITY OR FRUSTRATION
(1) Where, at the time a contract is made, a party’s performance under it is impracticable without his fault because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary....
Under either approach, the Court should analyze whether Cape-France had reason to know the subject property might be exposed to perchlorethylene, that such a possibility could impede the subdivision process, and whether such knowledge precluded a determination that Cape-France was excused from performance. Both parties find support in the record for contrary arguments regarding whether Cape-France should have been aware of potential contamination problems and whether Cape-France assumed such risks under the contract. Therefore, I would find that there are questions of material fact on these issues which would preclude summary judgment.
*525 ¶52 Additionally, I believe there were questions of material fact regarding whether performance was actually impracticable which should have precluded summary judgment. The record is not at all clear that Cape-France would have been subject to liability of an unquantifiable nature had it drilled the test well at issue. The basis for the District Court’s determination that summary judgment was appropriate were the letters from the Department of Environmental Quality to Cape-France and its agents. On December 21, 1995, the Department wrote Mr. Springer, the engineer hired by Cape-France, stating as follows:
The contamination appears to be extending north but the extent of the contamination is unknown. You and your client need to be aware of the consequences resulting from drilling wells in the vicinity of the plume. Water supply wells drilled in your proposed subdivision may tap contaminated groundwater or may become contaminated over time with pumping. If contaminated groundwater is encountered then advanced treatment of the water will be required. The legal owners of the subdivision lots will be hable under the Water Quality Act or other environmental laws (state or federal) if pollution results from improper well construction or if contaminated groundwater is pumped into a clean area .... At this point you should consider drilling a well on the site, conducting a pump test per WQB 3, 3.2.4, and sample for VOCs per EPA Method 524.2 ... [Emphasis added.]
¶53 The Department again wrote to Cape-France in January, 1996, this time notifying Cape-France that the subdivision was almost ready to be approved, and again requesting that the seller complete the well testing requirement:
Two items must be satisfied before the Department can issue approval on this subdivision:
1) A well must be drilled and pump tested per WQB 3, 3.2.4 ....
2) A plat of the proposed subdivision must be provided. [Emphasis added.]
¶54 The District Court then erroneously confused the two different and distinct messages which were conveyed to Cape-France by the Department’s letters. First, considering the possible effect of contamination in the area, the Department advised Cape-France, as the subdivision applicant, that future water supply wells drilled to supply the ongoing water needs for the subdivision, may, “over time,” become contaminated, require treatment, and impose liability. Secondly, in light of that possibility, the Department advised that it was imposing a subdivision requirement upon Cape-France to drill a pump test well. The purpose of the pump test well was not to provide for the subdivision’s water supply, but to determine whether the plume had yet affected the property.
¶55 Mistakenly assessingthis evidence, the District Court erroneously concluded that the drilling of a pump test well would impose upon Cape-France a potential “liability of an unquantifiable nature.” This Court then incorporated the District Court’s error into its opinion:
*526 Unfortunately, the only way to determine whether there is [contamination] and, if so, the extent of groundwater contamination is to drill a well. And that is the precise activity that may exacerbate the contamination problem.....
The majority has mistakenly confused the drilling of a test well-the standard and accepted method of determining the location of the contamination — with the operation of future supply wells. A test well is not the “precise activity” that may exacerbate the contamination problem. Rather, the Department warned that the long term pumping of water supply wells on the property would present this risk.
¶56 The further significance of this error is understood when the terms of the parties’ contract are considered. Pursuant thereto, Cape-France was the subdivision applicant and responsible for obtaining subdivision approval, an effort spearheaded by its engineer, Lowell Springer. It was Cape-France’s obligation to drill the test well as a condition of subdivision approval. Thereafter, it was the specific contractual obligation of buyer Peed-Moore to provide water for the property’s future development plans, and to address the long-term water supply issue. As such, it was Peed-Moore who was required under the contract to complete the future task which bore the potential “liability of an unquantifiable nature” about which the Department had warned.
¶57 Perhaps realizing this, Cape-France argued that Peed-Moore failed to indemnify them against any future pollution that Peed-Moore may cause on the property. While such indemnifications may not be unusual, Cape-France, experienced developers, chose not to ask for one at the time of their bargain in June 1994. Nor did they ask for an indemnification at the time they signed the Extension Agreement, approximately two months after consummation of the buy-sell agreement, even though at all times they had actual knowledge of the advancing plume. Furthermore, under the parties’ agreement, Cape-France agreed to assume the risk of loss until closing. If the facts, now ■unknown, would establish that Cape-France had sufficient knowledge of the contamination potential and then assumed such risks, the contractual provision would bar Cape-France’s demand for indemnification, and its failure to perform would not be excused for this reason.
¶58 The Department’s letter did intimate that Cape-France could be held responsible if contamination resulted from faulty well construction or testing and that advance treatment would be required if contaminated groundwater were encountered. However, the record is unclear in several important respects: (1) the likelihood that test wells could be safely drilled; (2) whether advance treatment of contaminated groundwater would be required as a condition of subdivision and who would be responsible; and (3) the actual cost of either the advance treatment of contaminated water or the clean up of contamination resulting from a faulty well. Indeed, both parties hold up the record to argue contrary positions regarding these factual matters. Thus, there are questions of material fact as to Cape-France’s *527 liability-and, therefore, the impracticability of performance-which should have precluded summary judgment.
¶59 Finally, I would also hold the District Court, erred in granting summary judgment on the grounds of mutual mistake, for largely the same reasons. Regarding the defense of mutual mistake, we have stated the following:
A mutual mistake occurs when the contracting parties share a common misconception about a vital fact upon which they based their bargain. Mitchell v. Boyer (1989), 237 Mont. 434, 437, 774 P.2d 384, 386. Parties cannot avoid a contract because of mutual mistake, however, if they bear the risk of a mistake. Restatement (Second) of Contracts §152 (1979). Parties bear the risk of a mistake when they know they have limited knowledge regarding the facts to which the mistake relates at the time the contract is made and treat their limited knowledge as sufficient. Restatement (Second) of Contracts §154(b) (1979).
Wray v. State Compensation Insurance. Fund (1994), 266 Mont. 219, 225, 879 P.2d 725, 728. As I noted above, there are questions of material fact regarding whether and to what extent the parties were aware of the risks of potential groundwater contamination and whether they assumed those risks. For the reasons expressed herein, summary judgment is inappropriate, and I would remand this case for further proceedings.
CONSTITUTIONAL ISSUES
¶60 I join in the concerns expressed by Chief Justice Gray and Justice Leaphart regarding the majority’s application of constitutional principles herein. This case can be resolved on the contract issues alone, consistent with this Court’s long tradition of declining to address constitutional issues where it is unnecessary. Further, while I do not dissent from the principles of environmental protection embodied in the Constitution, I do dissent from the majority’s sweeping application of those principles in this case.
¶61 First, the majority’s discussion of Article II, Section 3, of the Montana Constitution is incomplete. Article II, Section 3, states:
Inalienable rights. All persons are born free and have certain inalienable rights. They include the right to a clean and healthful environment and the rights of pursuing life’s basic necessities, enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and seeking their safety, health and happiness in all lawful ways. In enjoying these rights, all persons recognize corresponding responsibilities. [Emphasis added.]
While the majority discusses the inalienable right to a clean and healthful environment contained in Article II, Section 3, the Court fails to even mention, in a case about acquiring property, the co-existent inalienable right of our people contained in Article II, Section 3, to acquire, possess and protect property. The majority omits any discussion of the interaction or balancing, if any, of these rights, which *528 must occur when they are simultaneously at issue.
¶62 Second, the majority today holds that when the anticipated performance of a private, real property contract may potentially impact the environment, the contract’s purpose is unlawful, and rescission is the appropriate remedy. Moreover, the majority has unilaterally assessed the potential for environmental contamination, despite the involvement of the regulatory bodies responsible for that determination, and on a record that leaves much in doubt. In the present case, DEQ determined that a test well should be drilled in accordance with established state and federal guidelines to determine whether contamination existed. On the basis of a letter suggesting that liability could be incurred for future contamination, the majority has determined that the DEQ’s procedures for testing water pose an unconstitutional threat to the environment.
¶63 The decision leaves important questions unanswered. How certain must the potential be before the contract is deemed to have an unlawful purpose? How is a contract’s potential adverse impact on the environment to be measured? How significant must that potential impact be? As the record discloses in this case, it has not been established that the plume has actually moved onto the seller’s property. A misapprehension of fact-that a test well would exacerbate the existing contamination problem-has barred the test necessary to determine the plume’s present location. Is a notice from the State that there may be a pollution issue affecting a parcel of property sufficient enough to prohibit use of the property? While future decisions of the Court may eventually resolve such questions, far too much is today left in doubt.
¶64 The environmental provisions of the Constitution may very well apply in this case, and may prohibit development of the proposed subdivision. However, on a record which leaves the question of potential environmental damage unsettled, the applicability of the constitutional protections cannot properly be determined. I would order a remand of this case, and after the material facts are established, the contract and constitutional principles at issue here could be properly adjudicated.