Donovan, J.
This action arises out of a purchase and sale agreement (“Agreement”) between the plaintiff, the now deceased Harold M. Snow (represented by Helen DiCarlo Reale, the executrix of his estate) (“Snow”), individually and as president of West Newton Motor Mart as seller, and Frank Donato as buyer. Mark Donato and Steven Donato are the defendants in this case as assignees of Frank Donato (collectively “the Donatos”). The Agreement contained provisions which survived the closing date and set forth the conduct of the parties thereafter with regard to environmental activities by the plaintiffs and payment obligations of the defendants. It is these provisions which are the subject of the litigation which was filed as a complaint in equity. Each of the three counts seeks a declaratory judgment as follows: Count I, completion of the terms of the contract by plaintiffs and breach of contract by defendants; Count II, waiver of any objection to the plaintiffs’ compliance with paragraph 4(c) of the Agreement; and Count in, breach of the implied covenant of good faith and fair dealing constituting unfair and deceptive actions. Both parties have filed motions for summary judgment pursuant to Mass.R.Civ.P. 56 requesting judgment on all counts. For the reasons set forth below, the plaintiffs’ motion for summary judgment is DENIED and the defendants’ motion is ALLOWED.
BACKGROUND
After a hearing and review of the motions, numerous submissions and memoranda, the summary judgment record indicates the following undisputed facts.
1203 Washington Street in West Newton, Massachusetts, consists of land and buildings upon which *479 various automobile related businesses have been operated (“the property”). The property has been the subject of a number of environmental assessments since 1988 when two underground gasoline storage tanks located near the front of the building along Washington Street and a 250 gallon underground waste oil storage tank at the rear of the property were removed. Monitoring wells B-107 and B-201 were installed near the former gasoline storage tank site. Testing of B-107 revealed the presence of petroleum products in 1990 and a visual inspection in 1991 revealed the presence of “black petroleum hydrocarbon.” No testing was done relative to the location of the removed waste oil tank. In June 1991, a 1,000 gallon underground fuel oil storage tank was removed. The tank was observed to be apparently intact and corrosion free and no testing was done on the soil surrounding the tank.
Also at that time, a collapsed exterior catch basin was repaired and approximately 150 cubic yards (about 100 tons) of “oily soil” was excavated and disposed of off-site. Testing of the soil removed as well as remaining soil from the excavation site indicated the presence of petroleum hydrocarbon (TPH). Testing of floor drain and catch basin sediment likewise revealed the presence of TPH.
In 1990 the Donatos negotiated with Thomas Cullinane (“Cullinane”) to purchase the properly.[3] The record indicates that at least some of the negotiations occurred directly between the Donatos and Snow. The Donatos had an environmental assessment of the property done by TGG Environmental, Inc. (“TGGE”). The TGGE report indicated the presence of hazardous materials and oil inside the building; the presence of high levels of total petroleum hydrocarbons in the floor drains; and groundwater contamination in the monitoring wells. The Donatos requested an extension of time to do more testing which Snow denied. Simultaneous with that request, the Donatos also exercised their right under the purchase and sale to terminate the deal.
Negotiations regarding the property resumed between Snow and the Donatos in 1991 and resulted in the Agreement which is the subject of this dispute. The purchase price of the property was $1,500,000 with $1,300,000 financed by the seller. The Agreement was signed on March 19,1992, and the closing took place on or about May 1, 1992. The financing consisted of four promissory notes and three corresponding mortgages which were executed on June 17,1992.[4] All three notes incorporate the terms of the Agreement by reference.[5]
The portions of the Agreement pertinent to this dispute are contained in section (4)(b) paragraph two et seq. as follows:
The purpose of the five (5) year and two (2) month note and mortgage is partially to allow Seller sufficient time to environmentally clean the subject property and to remove hazardous material from the site, and obtain a satisfactory 2IE status conforming to the provisions of M.G.L.c. 21E and as provided for within the terms of this Agreement. Sellers agree to have the environmental cleanup engineering firm which they employ keep Buyer or Buyer’s cleanup engineering representative informed as to the progress of cleanup efforts.
In the event the property . . . does not have a satisfactory 2IE status as aforementioned within four years and two months of the date of closing, then in that event, the terms of the first mortgage and note shall be automatically renewed in one year increments until one year from the date of receipt by Buyer of a satisfactory 2 IE status . . .
In the event Sellers are unable to obtain a satisfactory 21E status as called for by the terms of this Agreement within the initial five year and two month term of the note and mortgage . . . Buyer shall have the right to retain the services of an environmental cleanup contractor to accomplish that objective . ..
From and after the date of closing any contamination . . . which is caused by Buyer or anyone claiming through Buyer shall be the sole responsibility of the Buyer with respect to cleanup and with respect to cleanup costs in order to insure that the subject real estate has a clean 2 IE status as called for by the terms of this Agreement. . .
For the purpose of this Agreement, a satisfactory 2 IE status is achieved when a report issued by the DEP for the Commonwealth of Massachusetts has been confirmed by Buyer’s environmental consultant, the substance of which indicates that no further environmental cleanup work is required regarding the property . . . although that report may indicate that the site requires continuing monitoring.
In any event, Buyer shall have the aforementioned 2 IE Report examined and verified by an environmental company of its choosing (an environmental company qualified and licensed by the Commonwealth of Massachusetts to perform site assessment and remediation with respect to potential environmental hazards) and such environmental company shall indicate its confirmation or rejection with respect to the aforementioned 2 IE Report within ten (10) weeks of the date of receipt of such report by a writing addressed to Sellers and mailed to sellers in accordance with the provisions of this agreement.
Any conclusion on the part of Buyer’s environmental company shall be a good faith conclusion premised upon environmental cleanup standards prevailing within the environmental cleanup industiy within the Commonwealth of Massachusetts as of the date of the aforementioned writing addressed to Sellers.
Also relevant to the dispute is a paragraph present in all of the promissory notes which provides as follows:
There are certain provisions in the aforementioned Purchase and Sale Agreement which pertain to obligations on the part of the Seller to perform 2 IE *480 clean-up functions concerning the subject real estate and concerning the time in which the clean-up functions must be performed. Consequently, the fact that the 2IE clean — up work continues during the term of this note regarding the real estate which is the subject matter of said note shall not in any event trigger foreclosure proceedings during the term of the note. In accordance with the terms of the aforementioned purchase and sale agreement the due date of this note may be modified in order to allow Seller to perform the 2IE clean-up functions provided for within the terms of such purchase and sale agreement.
No assessment or remediation activities occurred on the property between June 1992 and June of 1995. In June 1995, B-107 was again tested with results consistent with prior testing. As a result two additional monitoring wells were installed in Washington Street upgradient of B-107. Test on samples from these wells also revealed petroleum hydrocarbon. Thereafter, Snow, through Loitherstein Environmental Engineering (“LEE”) filed a Downgradient Property Status opinion naming the Gulf Service Station located at 1200 Washington Street as the source of the LNAPL gasoline.
On August 16, 1996, Snow tendered the Downgradient Property Status opinion (DPS) to the Donatos. Snow asserts that this document satisfies the 2 IE status provision of the Agreement and triggers the 10 week response period provision and its attendant obligations for the Donatos. The Donatos responded to the DPS by notifying Snow that they did not acknowledge the letter as fulfilling the 2 IE status provision and therefore did not trigger any obligations on their part.
No remediation activities have occurred on the property to date. The Donatos have made all interest payments in conformance with the terms of the notes under the terms of extension therein and deny the occurrence of any event triggering their obligation to pay the balances due on the notes. The Donatos have not yet arranged for financing to pay the balances due to Snow under the agreement.
DISCUSSION
This court grants summary judgment when there are no genuine issues of material fact and when the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time Inc., 404 Mass. 14, 17 (1989). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Id. at 17.
This is a contract dispute requiring the interpretation of the Agreement to resolve the legal issues. The relevant terms and provisions of section (4)(b) of the Agreement are in dispute. The interpretation of those terms and provisions is an issue of law which must be decided by the court. See Lumbermen’s Mutual Ins. Co. v. Zoltek Corp., 419 Mass. 704, 707 (1995).
Established principles of contract law dictate that the terms and provisions of a contract be given reasonable effect to yield a rational business document which manifests the intent of the parties. See McMahon v. Monarch Life Ins. Co., 345 Mass. 261, 264 (1962). In doing so, the interplay of other phraseology within the document must be considered so as to produce a workable and harmonious interpretation. See J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 794 (1986). An omission, however, cannot be supplied merely by conjecture but rather must be supported by sufficient declaration in the instrument as a whole and the underlying intention. Spaulding v. Morse, 322 Mass. 149, 152-53 (1948).
Section (4)(b) of the Agreement provides an explanation for the five year and two month term of the notes as in part “to allow [Snow] sufficient time: (1) to environmentally clean the subject property, (2) to remove hazardous material from the site, and (3) obtain a satisfactory 2IE status conforming to the provisions of M.G.L.c. 2 IE and as provided for within the terms of this Agreement.” The final sentence of the paragraph provides that Snow is to keep the Donatos apprised of the “progress of the cleanup efforts.” Nothing in the plain language of the provisions indicates that any of the three items may be eliminated or by-passed. The requirement of environmental cleanup by Snow is likewise consistent with the provision in the promissory notes allowing for modification of the repayment terms “to allow Seller to perform the 2IE clean-up functions provided for within the terms of such purchase and sale agreement.” Accordingly, Snow is required, under the Agreement, to perform remediation activities to render the property environmentally clean as a condition precedent to obligations imposed on the Donatos.
The Agreement does not define environmentally clean in terms of specific objective values measurable by testing the soil but rather defines it in a subjective manner relevant to G.L.c. 21E. Accordingly, the property is clean if a “satisfactory 2 IE status is achieved.” Such satisfactory 21E status is achieved when a report confirmed by the Donatos’ environmental consultant indicates in substance that “no further environmental cleanup work is required regarding the property . . . although that report may indicate that the site requires continuing monitoring.” The Agreement further requires that the Donatos’ environmental company should render its conclusions in good faith and “premised upon environmental cleanup standards prevailing within the environmental cleanup industry within *481 the Commonwealth of Massachusetts as of the date of the [2IE report].”
As with most things in life, timing is everything. Bardon Trimount, Inc. v. Louis E. Guyott, Jr. and others, 2000 WL 1050962 Mass.App.Ct. 5. Snow argues two things: (1) the DPS opinion fulfills the 2IE status requirement in the Agreement because it indicates that no further environmental cleanup work is required regarding the property, and (2) Snow cannot environmentally clean the property because of the incursion of contamination from a source outside the property.
First, as discussed above, the Agreement requires Snow to environmentally clean the property and provide an acceptable 21E status. The language in the Agreement that “no further environmental cleanup work is required at the property” is most logically viewed in the context of the Agreement as rendered in 1991. The Agreement anticipated that the 2 IE status would indicate that no further cleanup work was necessary after the cleanup work required under the Agreement was completed. Changes in G.L.c. 2IE since the execution of the Agreement do not deprive the Donatos of benefits for which they bargained— cleanup activities at the property.[6] The plaintiffs may not unilaterally vary the terms of the contract.
Snow argues that in any event, G.L.c. 2 IE, §5D provides him exemption from performing cleanup operations at the properly. Section 5D exempts persons such as Snow from liability under Chapter 2 IE or at common law if such person did not cause or contribute to the release. Liability under a contract is expressly exempted from this protection. Snow’s liability for the cleanup of the property results from the Agreement and therefore G.L.c. 2IE, §5D provides no exemption for his liability to the Donatos.[7]
Snow alternatively argues that the property cannot be environmentally cleaned because of the incursion of contamination from a source outside the property— frustration of purpose or impossibility — which would render the Agreement invalid.[8] Implicit in these legal doctrines is the idea that certain risks are so unusual and have such severe consequences that they are beyond the scope of the agreement made by the parties. Mishara Constr. Co, Inc. v. Transit-Mixed Concrete Corp., 365 Mass. 122, 128-29 (1974). “To require performance in that case would be to grant the promisee an advantage for which he could not be said to have bargained in making the contract.” Id. at 129. The argument that the contamination is worse now because of upgradient incursion is inappropriate here. The contamination existing at the time of the agreement was acknowledged and its cleanup was contracted for. Had Snow proceeded to perform his obligations under the contract in 1992 any subsequent incursion would have been irrelevant. Likewise to claim now that the then existing contamination was caused by some other source is irrelevant. The parties agreed that contamination existed at the time of the execution of the agreement and that Snow would clean it up. Further, the Agreement anticipates the presence of after-arising contamination on the property that was not caused by Snow and for which he cannot be held responsible. “From and after the date of the closing, any contamination caused by Buyer or anyone claiming through Buyer shall be the sole responsibility of the Buyer with respect to cleanup and with respect to cleanup costs in order to insure that the subject real estate has a clean 2 IE status as called for by the terms of the Agreement.” The existence of contamination from an upgradient source, the extent thereof, and the time it occurred are questions of fact about which the parties disagree but who may be responsible for what portion of the cleanup under this provision is an issue not properly before this court.
One final issue remains to be resolved although it has not been directly addressed by the parties. Count III complains of “unilateral election to conduct M.G.L.c. 2IE testing on the site without notice to [Snow]” resulting in a violation of the implied covenant of good faith and fair dealing and is an unfair and deceptive act. Under the terms of the contract, the Donatos had the right to retain the services of an environmental cleanup contractor to accomplish the Agreement’s objectives if Snow failed to do so within the five years and two months allotted in the Agreement. If such was undertaken the Donatos would be required to provide written notice within thirty days prior to actually retaining such services. The complaint fails to identify when or what testing was performed. The complaint does not allege that the Donatos embarked on cleanup activities unannounced. Nothing in the agreement prevents the Donatos from having tests performed on the property or requires them to notice Snow thereof. As to the claims that the acts were unfair and deceptive, in light of the subject matter of this suit and the activities of the defendant, the court can hardly say that the testing was unfair, deceptive, or rose to the level of rascality that would raise the eyebrows of such seasoned business people. See Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 504 (1979).
ORDER
For the foregoing reasons the court ORDERS that the plaintiffs’ motion for summary judgment is DENIED and defendants’ motion for summary judgment is ALLOWED on all counts. Judgment shall enter accordingly.

Cullinane, on behalf of Auto Management Corp., Inc., was Interested in exercising a right of first refusal to purchase the property and inquired of the Donatos whether they would be interested in purchasing the property.

The financing arrangement described in the Agreement consisted of one mortgage for the full $1,300,000. Thereafter *482 that arrangement was changed to three mortgages and four promissory notes for $900,000, $225,000, $100,000 and $75,000. The record does not Indicate the existence of a mortgage for the $75,000 note.
The terms of the notes are as follows:
Two notes, one for $900,000 and one for $100,000, are interest only notes at eight percent (8%) paid monthly in arrears, with, the balance due in or within five (5) years and two (2) months from the execution dates. In the event of default, the note with interest accrued becomes due and payable on the option of the holder of the note.
One note for $225,000.00, an interest only note at eight percent (8%), with the following payment schedule: yearly payments of $75,000 each year beginning two years and two months after the date of conveyance of the title to the property for a total of three years. A final payment of $54,000 in accrued interest is due five years and two months from the date of execution of the note.
One note for $75,000.00, an interest only note at eight percent (8%), with the following payment schedule: yearly payments of $25,000 each year beginning two years and two months after the date of conveyance of the title to the property for a total of three years. A final payment of $18,000 in accrued interest is due five years and two months from the date of execution of the note.

Each promissory note includes the following paragraph:
The obligations of this Note are subject to the terms of a certain Purchase and Sale Agreement, dated March 19, 1992, between West Newton Motor Mart, Inc. [and Snow], as seller, and Donato, as Buyer, relating to the real estate which is the subject matter of this Note.

Additionally, G.L.c. 21E, §5D(d)(2) and (3) also pose potential obstacles for Snow as it does not relieve a person from liability for releases “that originate on the downgradient or downstream property" or “that originate on the downgradient or downstream property . . . and commingled with the oil or hazardous material migrating from upgradient or upstream property . . ."At this point a question of material fact exists as to the source of the contamination.

G.L.c. 21E, §5D exempts a person from liability to third parties and to the state for “contribution, response action costs or property damage pursuant to this chapter or for property damage under common law, except for liability arising under a contract."

Snow argues that contamination incursion from an upgradient source makes cleanup “impossible." The Agreement anticipates cleanup of contamination on the property at the time of the agreement but does not guarantee that the property will remain clean thereafter. Therefore compliance with the cleanup provisions of the Agreement is not impossible.