Davis, Brian A., J.
Introduction
This is an unhappy dispute between family members concerning the disposition of the family homestead. The property at issue is located at 236 Union Street, Hanover, Plymouth County, Massachusetts (the “Property”). Plaintiff Kathleen Whitcomb (“Mrs. Whitcomb”) is the daughter of Defendant Mary L. Smith (“Mrs. Smith”).[1] Plaintiff Scott Whitcomb (“Mr. Whitcomb”) is Mrs. Whitcomb’s husband. Mrs. Whitcomb grew up on the Property with her parents, the Smiths.
By means of this action, the Whitcombs seek to enforce a written agreement whereby the Whitcombs agreed to move onto the Property with the Smiths, to expand and help maintain it, and to provide assistance to the Smiths in their senior years, in return for the Smiths’ agreement eventually to transfer the Property to the Whitcombs. The parties actually lived together on the Property for approximately eight and a half years beginning in 2000, but their arrangement ended in a hail of recriminations and lawyer letters in or about early 2009. The Smiths never did transfer the Property to the Whitcombs, and Mrs. Smith still refuses to do so on the ground that the Whitcombs purportedly failed to uphold their end of the parties’ bargain. Mrs. Smith also has asserted a counterclaim against the Whitcombs for damage that they allegedly caused to the Property while they resided there, and for various unpaid costs and expenses that Mrs. Smith claims she still is owed.
All efforts to resolve this family dispute short of a full-blown trial were unsuccessful, with the result that the Court tried the case, juiy-waived, for three days between February 4 and February 7, 2014. The parties subsequently made various post-trial submissions in advance of closing arguments on March 13, 2014. After closing arguments, the Court made certain preliminary findings and rulings from the bench and invited the parties to submit an agreed-upon form of judgment. The parties were unable to agree on a form of judgment, however, which precipitated a further round of post-trial submissions in April and May of this year. Having now received and reviewed all of the parties’ submissions, the following constitutes the Court’s formal findings of fact, rulings of law and order for judgment.
Findings of Fact[2]
As previously noted, the parties to this action are related to one another. Plaintiff Kathleen Whitcomb is the daughter of defendant Mary Smith, and plaintiff Scott Whitcomb is her husband. The Property at issue was purchased by Mrs. Smith and her now-deceased husband, William Smith, many years ago, and Mrs. Whitcomb was raised there as a child. After she married, Mrs. Whitcomb moved to nearby Rockland, Massachusetts and lived there with Mr. Whitcomb and their children for thirteen years while the Smiths continued to reside on the Property.
In the mid-1990s, Mr. Smith’s health started to decline. Concerns about Mr. Smith’s health and his long-term care apparently led the Smiths, in early 1999, to suggest to Mr. and Mrs. Whitcomb that they move onto the Property and live there with the Smiths.[3] More specifically, the Smiths proposed building anew “in-law” addition to their existing house on the Property where they (i.e., the Smiths) would live, thereby freeing up the main house for the Whitcombs *173 and their children. The Whitcombs, in turn, would pay for the construction of the addition (including making the monthly payments on any mortgage loan obtained by the Smiths to build the addition), pay a portion of the real estate taxes, utilities, maintenance costs and other expenses associated with the Properly, and eventually receive title to the Property from the Smiths.
The Whitcombs agreed to the Smiths’ proposal. In order to memorialize their joint understanding, Mr. Smith prepared a handwritten, two-page “Agreement between William H. and Mary L. Smith and Scott H. and Kathleen A. Whitcomb relative to [the Property]” (the “Property Agreement” or, simply, the “Agreement”). Trial Exhibit (“Trial Ex.’j 1. The original Property Agreement was circulated among, but never signed by, the parties.[4] The first paragraph of the Property Agreement recites the Smiths’ “strong desire to keep the [Property] in the family due to its excellent location . . .” Id., p. 1. The second paragraph of the Agreement sets forth the terms of the parties’ understanding, which are described as follows:
A. An addition will be built onto the existing structure at 236 Union St. per attached exhibit A.
B. William H. Smith and Mary L. Smith will occupy this addition only and Scott and Kathleen Whitcomb and children will occupy the remainder of the house only.
C. In so far as possible, Scott and Kathleen Whitcomb will pay for the cost of this addition in toto including any costs associated with additions to the property as required by state or municipalities because of the addition.
D. Transfer of the entire property from William H. and Maty L. Smith to Scott and Kathleen Whitcomb will be made by legal means that will minimize the tax exposure to Scott and Kathleen Whitcomb.
E. Regardless of circumstances, the rights of William H. and Maty L. Smith to abide in the addition as their home will not be denied or restricted until either:
(i) Both are deceased [or]
(ii) Each decides to leave on their own volition without coercion of any kind from any party.
Id. (emphasis in original).
Page two of the Property Agreement contains a summary of the “Approximate Financial Details” of the parties’ arrangement, including estimates for the cost of the addition ($150,000) and the Smiths’ expected resulting mortgage balance ($120,000), and a provision titled “Gift Tax Exposure,” which states, in relevant part, that the “estimated gift amount from William H. and Mary L. Smith to Scott H. and Kathleen L. Whitcomb is . . . $273,000,” and that a “method of transfer of this asset amount that will minimize the net tax exposure to Scott and Kathleen Whitcomb will be sought.” Trial Ex. 1, p. 2.
Significantly, the Property Agreement does not specify exactly when the Smiths would “[transfer . . . the entire properly to Scott and Kathleen Whitcomb,” but the Court finds, based on all of the credible evidence, that the parties understood a transfer would be made, if not immediately, then certainly within a reasonable time after the Whitcombs moved onto the Property. See, e.g., Mishara Constr. Co. v. Transit-Mixed Concrete Corp., 365 Mass. 122, 125 (1974) (Where “no time for performance is set out in the contract, . . . the court by long established rule will imply a reasonable time”). This finding is consistent with, and further supported by, Mr. Smith’s contemporaneous notes concerning the transaction, which state, in part, “Ownership—do they [i.e., the Whitcombs] understand gradual ownership?” Trial Ex. 60.
After the parties entered into the Property Agreement, implementation of the terms of that agreement proceeded largely on schedule. In May 1999, an appraiser estimated the fair market value of the Property to be $270,000. Trial Ex. 2. The Smiths retained a general contractor, David Capaccioli, who agreed to build the addition to the Property for an estimated price of $138,000, not including any painting, carpeting, fixtures, appliances or finished woodwork or flooring on the second floor of the addition. Trial Ex. 3. Work on the Properly commenced in the fall of 1999 and was substantially complete by about June 2000. The final cost of the construction and renovation work at the Properly amounted to more than $170,000 due, in significant part, to the Smiths’ decision to finish the second floor of the addition and to install more expensive countertops in their new kitchen. Most of the work was financed with the proceeds of an additional $120,000 mortgage loan that the Smiths obtained from South Shore Bank in June 1999 (although a portion of the loan proceeds also went to pay off the $17,800 balance on the Smiths’ existing home equity line of credit). Trial Ex. 4, 5 and 6. The remaining funds came from the Whitcombs, who agreed to contribute $33,000 from the sale of their home in Rockland and to pay for an additional $10,615 in improvements from their own savings, and from a new $80,000 line of credit obtained by the Smiths.
In the spring of 2000, Mr. and Mrs. Whitcomb sold their home in Rockland and moved into the main house on the Property, and the Smiths moved into the new addition. In selling their home in Rockland and moving onto the Property, the Whitcombs reasonably relied upon the terms of the Property Agreement, including the Smiths’ explicit promise ultimately to transfer ownership of the Property to the Whitcombs.
What happened in the years after the Whitcombs moved onto the Property is the central issue in dispute between the parties. Mrs. Smith asserts that the Whitcombs missed “numerous” mortgage payments on the Property between June 2000, when they moved *174 onto the Property, and March 2009, when they left the Property, and that they “never contributed in any meaningful way” to the real estate taxes, utilities, maintenance costs and other expenses associated with the Property. See Amended Answer and Counterclaim of Defendant Mary L. Smith, filed July 18, 2011 (“Defendant’s Counterclaim”), ¶12; Defendant’s Post-Trial Brief, filed March 4, 2014 (“Defendant’s Brief’), p. 5. On this basis, Mrs. Smith argues that the Whitcombs “were in material breach of the [Property] Agreement from the onset” and, therefore, she has no obligation, contractual or otherwise, to transfer the Property to the Whitcombs. Defendant’s Brief, p. 6.
The Whitcombs, conversely, assert that they substantially performed their obligations under the Property Agreement by making regular mortgage payments on the Property, or by giving an equivalent amount of money to the Smiths each month so that the Smiths could make the required payments, for almost a decade, and by paying certain utility bills directly and making regular, additional monetary payments to the Smiths in amounts sufficient to compensate the Smiths for the Whitcombs’ share of the taxes and other expenses associated with the Property while they lived there. Plaintiffs’ Proposed Findings of Fact and Rulings of Law, filed February 28, 2014 (“Plaintiffs’ Proposed Findings”), Finding Nos. 24, 26-27, 35-36, 47. Having allegedly fulfilled their duties under the Property Agreement, the Whitcombs argue that they now are entitled to specific performance of Mrs. Smith’s promise to give them title to the Properly or, alternatively, to an award of money damages for their related damages. Id., Ruling Nos. 3-4, 13.
A substantial volume of evidence was presented at trial concerning the parties’ financial dealings with one another in the years 1999 to 2009. The trial exhibits include literally thousands of cancelled checks, check registers, deposit slips, bank account statements, charge receipts and other payment records going back more than a decade. The Court recognizes that there are some inevitable gaps in the documentation, and that discerning precisely who paid what to whom and why is not always possible. The Court finds, however, that the Whitcombs have established by a preponderance of the evidence that they made at least the following payments to the Smiths, or on their behalf, from approximately June 2000 to late 2008:
[[Image here]]
[[Image here]]
At trial, Mrs. Smith disputed that she and/or her husband received, or received the benefit of, many of the payments included in the foregoing summary. The Court specifically finds Mrs. Smith’s testimony on this point to be inconsistent with the documentary evidence and otherwise not credible.
For example, Mrs. Smith insists that the Whitcombs “never contributed in any meaningful way” to the real estate taxes, utilities, maintenance costs and other expenses associated with the Property. Defendant’s Brief, p. 5. Agreed-upon Trial Exhibit 20 establishes, however, that the Whitcombs regularly paid large sums of money by check, often in the amount of $500 or more, to Mrs. Smith for “House,” “Air Conditioning],” “Mort[gage]/Taxes,” and other “Mise.” expenses associated with the Property. Trial Ex. 20. When asked at trial to provide an alternative explanation for these various payments by the Whitcombs, Mrs. Smith had none to offer.
Similarly, Mrs. Smith continues to assert, without reservation, that the Whitcombs made no mortgage payments on the Property “after February 2005 until they started paying sums directly to William [Smith] on May 5, 2007,” but, once again, the documentary evidence is directly to the contrary. Compare Defendant’s Brief, p. 4, and Trial Ex. 19 (bank receipts for mortgage payments made by the Whitcombs directly in March and December 2005); and Trial Ex. 100 (documentary evidence of regular cash withdrawals by the Whitcombs in 2005 and 2006 in the exact or approximate amount of the monthly mortgage payment on the Property, which cash withdrawals the Whitcombs credibly testified were paid over to Mrs. Smith at her request).
Considering the testimony and the record as a whole, the Court finds the evidence favoring the Whitcombs’ version of underlying events to be decidedly more persuasive. While their performance may not have been perfect in every respect, the Whitcombs, by and large, made the payments called for in the Property Agreement from 2000 through 2008, as described above, in accordance with the varying wishes and instructions of the Smiths. To the extent that the *175 Whitcombs may have failed to make some small percentage of the payments owed, or may have failed to make some small percentage of the payments owed in a timely manner, such failures were not material in the circumstances. The Court therefore finds that the Whitcombs substantially performed their obligations to the Smiths under the Property Agreement.[5]
Unfortunately, the Whitcombs’ performance did not prevent the parties’ relationship from suffering an irreparable breakdown in mid- to late-2008 and early 2009. The Court perceives that not all of the reasons for that breakdown were discussed at trial, but the parties’ simmering dispute over their respective rights and obligations under the Property Agreement undoubtedly played a key role in causing the rift. On December 24, 2008, the Smiths’ attorney sent the Whitcombs a letter and a written six-month “Occupancy Agreement,” which effectively notified the Whitcombs that they would have to vacate the Property on or before June 30, 2009. Trial Ex. 40. The Whitcombs actually moved out of the Properly in early March 2009. Two months later, they commenced this action.
Mrs. Smith has continued to reside in the addition to the Property since the Whitcombs moved out of the main house in March 2009. For some unspecified period of time after March 2009, Mrs. Smith rented the main house to a third parly for approximately $3,000.00 per month. None of those rental proceeds were shared with the Whitcombs. As of the time of trial, the main house on the Property was vacant and the Property, as a whole, had an appraised value of approximately $427,000.00. Trial Ex. 41.
Rulings of Law
I. The Parties’ Liability to One Another Under the Property Agreement
Resolving the liability issues presented in this case is not difficult. The Property Agreement constitutes a binding contract between the parties because the evidence demonstrates that they agreed on the material terms of the Agreement, and that they had the present intention to be bound by those terms. Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000). While neither the Smiths nor the Whitcombs actually signed the Property Agreement, Mrs. Smith is estopped from asserting the Statute of Frauds as a defense to the Whitcombs’ claims based on the Whitcombs’ detrimental reliance upon, and partial performance of, the Agreement. See, e.g., Nessralla v. Peck, 403 Mass. 757, 761 (1989) (“A plaintiffs detrimental reliance on, or part performance of, an oral agreement to convey property may estop the defendant from pleading the Statute of Frauds as a defense”) (citation omitted); Gordon v. Anderson, 348 Mass. 787, 787 (1965) (oral agreement to transfer real property is binding where plaintiff gave down payment, took possession, made substantial improvements to property, and sold prior residence).
Having determined that a binding, enforceable contract exists between the Whitcombs and' Mrs. Smith, the next question is whether either side has materially breached that contract. A material breach occurs when there is a “breach of an essential and inducing feature of the contract,” Prozinski v. Northeast Real Estate Servs., LLC, 59 Mass.App.Ct. 599, 608 (2003) (quotation marks omitted), or, put differently, there is a “substantial breach going to the root of the contract.” Aerostatic Eng'g Corp. v. Szczawinski, 1 Mass.App.Ct. 141, 145 (1973). Whether a particular breach is “material” is a question of fact for the factfinder. Lease-It, Inc. v. Massachusetts Port Auth., 33 Mass.App.Ct. 391, 396 (1992).
The “root” of the Property Agreement at issue in this case is the mutually-beneficial arrangement among the parties whereby the Whitcombs would pay for an addition to the main house on the Property for the Smiths, physically move onto the Property with the Smiths in the Smiths’ senior years, and pay a portion of the ongoing expenses associated with jointly operating and maintaining the Property in return for eventual title to the Property. The Whitcombs have upheld their end of that bargain. More specifically, the Whitcombs, as this Court already has found, substantially performed their obligations to the Smiths under the Property Agreement by timely making most, if not all, of the payments called for in that Agreement from 2000 through 2008.
Mrs. Smith, on the other hand, has materially breached the Property Agreement by steadfastly refusing to transfer title to the Property to the Whitcombs and by effectively evicting the Whitcombs from the main house on the Property in early 2009. What constitutes a “reasonable time” for Mrs. Smith to make that transfer is a question the Court need not answer when, more than fifteen (15) years after the Property-Agreement was entered into, that time period undoubtedly has long since passed. The net effect of Mrs. Smith’s actions (or inaction) has been to deprive the Whitcombs of an “essential and inducing feature” of the Property Agreement, that being the ability to live on the Property and ultimately call it their own. Prozinski, 59 Mass.App.Ct. at 608. Mrs. Smith’s material breaches of the Property Agreement entitle the Whitcombs to appropriate relief under Count I of their Verified Complaint alleging breach of contract.[6]
Because the Court already has determined that the Whitcombs substantially performed their obligations under the Property Agreement, Mrs. Smith’s counterclaim alleging otherwise is rejected as contrary to the evidence and will be dismissed.
II. The Relief Awarded
While determining liability in this action is relatively simple, fashioning appropriate relief presents a far more challenging task. The Whitcombs seek specific performance of the Property Agreement due, in large part, to the unique nature of the Property. See, *176 e.g., Greenfield Country Estates Tenants Ass’n, Inc. v. Deep, 423 Mass. 81, 88 (1996) (“It is well-settled law in this Commonwealth that real properly is unique and that money damages will often be inadequate to redress a deprivation of an interest in land”). Whether to order specific performance in a particular instance is a matter “within the sound discretion of the judge.” Id. at 87. If the Court decides to do so, the goal should be to “produce as nearly as is practicable the same effect that the performance due under [the] contract would have produced.” See Restatement (Second) of Contracts §357, cmt. a. “(A]nd in recognition that specific performance is a remedy that is equitable in nature, the [court’s] order may reflect such equitable considerations as the judge in the exercise of sound discretion may deem appropriate.” Roy v. George W. Greene, Inc., 404 Mass. 67, 72 (1989).
The Court is persuaded that ordering specific performance of the Property Agreement is an appropriate remedy in this case, if only because no other form of relief appears to be viable or financially feasible.[7] The challenge comes in crafting an order that, to the greatest extent reasonably possible, gives effect to the mutual obligations of the parties under that Agreement, including both the Whitcombs’ right to have Mrs. Smith “[transfer . . . the entire properly” to them and Mrs. Smith’s right to continue to live on the Property until she dies or “decides to leave on [her] own volition without coercion of any kind from any party.” Trial Ex. 1, p. 1. The relief awarded by the Court by means of this order is intended to give the Whitcombs and Mrs. Smith one last opportunity to coexist on terms that fairly approximate the original terms of the Property Agreement. If relations between the parties do not permit such a result, either now or in the future, then it is Mrs. Smith who will have to yield to the rights of the Whitcombs because it is her material breaches of the Agreement that created the current situation.
Order for Judgment
For the foregoing reasons, it is hereby ORDERED that:
1. Judgment shall enter for plaintiffs Scott H. Whitcomb and Kathleen A. Whitcomb (the “Whitcombs”) against defendant Mary L. Smith (“Mrs. Smith”) on Count I of their Verified Complaint alleging breach of contract. Counts IV and V of the Whitcombs’ Verified Complaint are dismissed as moot;
2. Mrs. Smith’s counterclaim against the Whitcomb’s for breach of contract is dismissed with prejudice;
3. As soon as practicable, but in no event any later than one hundred twenty (120) days from the date of this Order, Mrs. Smith shall transfer all of her right, title and interest in the real property located at 236 Union Street, Hanover, Plymouth County, Massachusetts (the “Property”) to the Whitcombs for one dollar ($1.00);
4. Before or contemporaneous with the transfer of the Property from Mrs. Smith to the Whitcombs, the ■Whitcombs shall either: (a) fully assume all of Mrs. Smith’s rights and obligations under the existing note and residential mortgage on the Property if they are permitted to do so by the relevant lending institution; or (b) pay off Mrs. Smith’s obligations under the existing note and residential mortgage on the Property in full by whatever means the Whitcombs choose, which means expressly may include alternative financing that incorporates a mortgage on the Property;
5. Before or contemporaneous with the transfer of the Property from Mrs. Smith to the Whitcombs, either: (a) the Whitcombs and Mrs. Smith (collectively, the “Parties”) shall enter into a mutually-acceptable residential lease agreement that permits Mrs. Smith to continue to reside in the addition to the main house on the Properly (the “Addition”) until such time as Mrs. Smith dies, voluntarily chooses to reside elsewhere or is required to reside elsewhere due to personal or medical reasons; or (b) Mrs. Smith shall vacate the Property;
6. In the event that the Parties enter into a mutually-acceptable residential lease agreement, the terms of said lease shall provide, in part, that Mrs. Smith has no obligation to pay rent to the Whitcombs while she resides in the Addition, although Mrs. Smith may be required to pay a fair and reasonable share of the actual utility costs and real estate taxes on the Property on a monthly or quarterly basis for as long as she resides there. For as long as the Parties reside together on the Property, they each shall comply with all laws governing residential landlord-tenant relationships in the Commonwealth of Massachusetts, including, but not limited to, the right of quiet enjoyment;
7. In the event that: (a) the Parties are unable to agree upon a mutually-acceptable residential lease agreement and Mrs. Smith vacates the Property; or (b) the Whitcombs or Mrs. Smith subsequently breach any lease agreement between the Parties, with the result that Mrs. Smith vacates the Property, then the Whitcombs shall pay Mrs. Smith, each month that Mrs. Smith is alive and able to live independently, an amount of money equal to the fair market rental value of the Addition. The fair market rental value of the Addition shall be determined, on an annual basis, by an independent, licensed real estate broker selected by the Parties or, in the event the Parties are unable to agree, appointed by the Court;
8. If Mrs. Smith no longer resides on the Properly for any reason, the Whitcombs shall be permitted to exercise complete dominion and control over the Addition, including, but not limited to, occupying the Addition or renting some or all of the Addition to a third party of the Whitcombs’ choosing if they so desire;
9. The Parties shall reasonably cooperate with one another in their respective efforts to comply with the terms of this Order. Any violation of the terms of this *177 Order may be actionable as a civil contempt pursuant to Mass.RCiv.P. 65.3, justifying the imposition of costs, attorneys fees and other sanctions as the Court may deem appropriate in the circumstances; and
10. Until further order of the Court, Judge Brian A. Davis shall retain jurisdiction of this action for all purposes, including, but not limited to, any proceedings concerning the implementation and/or administration of this Order.

 Mrs. Smith’s husband and Mrs. Whitcomb’s father, William Smith, originally was another defendant to this action. Mr. Smith passed away in 2011, leaving Mrs. Smith as the sole remaining defendant.

 The Court’s findings of fact are based upon its consideration of all of the evidence presented at trial. In appropriate instances, the Court makes reference to specific testimony or exhibits in order to identify the precise evidentiary basis for its findings. To the extent that the Court makes no reference to the testimony of a particular trial witness or to a particular trial exhibit, the Court finds either that the content of such testimony or exhibit was not genuinely disputed, was not persuasive or credible, or was not germane to the issues to be decided. As a general matter, the Court finds the Whitcombs’ testimony to be more credible than Mrs. Smith’s for the reasons explained at pages 7-9, infra.

 Mrs. Smith testified at trial that one of the primary purposes for having the Whitcombs move onto the Property in 2000 was to help her “keep Mr. Smith at home.”

 Mrs. Smith asserted at trial that she did not see the Property Agreement until 2009 and that she never agreed to be bound by its terms, but the Court does not credit her testimony in this regard. Indeed, the allegations of Mrs. Smith’s original counterclaim in this case are directly to the contrary. See Counterclaim of William H. Smith and Mary L. Smith, filed July 27, 2009,114 (“The intention of the parties in July of 1999 and thereafter was that if the Whitcombs fulfilled their obligation to pay for the addition of the in-law apartment and paid their share of costs associated with their portion of the house then and only then would the Smiths deed them an interest in the property”).

 he Court regards Mrs. Smith’s motive for failing to transfer the Property to the Whitcombs pursuant to the terms of the Property Agreement as irrelevant to the question of whether she has an obligation to do so. See Kattar v. Demoulas, 433 Mass. 1, 7-8 (2000) (Defendant’s motive for its actions is irrelevant to plaintiffs claim for breach of contract). To the extent that Mrs. Smith’s motive may inform the Court’s interpretation of events, however, the Court finds that Mrs. Smith’s continuing failure to transfer the Property to the Whitcombs has been driven, in significant part, by her interest in extracting the available equity from the Property for her own use through a series of mortgage refinancings and new home equity loans. See Trial Exs. 12-15, 17, 44. These transactions have netted Mrs. Smith more than $175,000.00 since 2003, and have increased the outstanding mortgage balance on the Property from approximately $120,000 in 2000 to approximately $410,000 at present.

 he Court’s findings of fact, rulings of law and order for judgment with respect to the Whitcombs’ claim for breach of contract (Count I) effectively moot their related claims for unjust enrichment (Count TV) and constructive trust (Count V) given that the resulting relief, if any, would be similar or identical to the relief granted herein. The Whitcombs’ claims for fraud and deceit (Count II) and intentional misrepresentation (Count III) were waived on the first day of trial.

 In reaching this conclusion, the Court is cognizant of Mrs. Smith’s assertions, which the Court finds credible in the circumstances, that she has extremely limited financial means, consisting solely of her “social security income and a small survivor’s pension,” and that she cannot “afford to make additional principal payments towards the [existing] mortgage” on the Properly. Defendant’s Proposed Findings of Fact, dated April 25, 2014, p. 2.